STATE OF NORTH CAROLINA v. THOMAS LEE BILLINGS

No. 9014SC1226

(Filed 5 November 1991)

**1. Evidence and Witnesses § 655 (NCI4th) — motion to suppress in-court and out-of-court identifications — denied — evidence supporting findings sufficient**

The evidence was sufficient to support findings of fact made by the trial court in an assault and robbery prosecution in denying defendant's motion to suppress identifications of defendant made both in and out of court. The victim did not see her assailant's face, but knew that he was male and of African American descent; the victim heard the car stall three times after he took her keys and attempted to drive away; within three minutes, a witness saw a car stopped in the street; the position of the stopped car forced other cars to cross into the oncoming lane to pass by; as the witness drove around the stopped car, she saw an African American man; on voir dire, an officer testified that a flier showing the victim's car led him to the witness; the witness worked with an artist to produce a sketch; she was shown a photographic array containing a photograph of defendant taken several years earlier; the witness identified the photograph of defendant as close; and she identified defendant in a subsequent array containing a current photograph of defendant.

**Am Jur 2d, Evidence § 372.**

STATE v. BILLINGS

[104 N.C. App. 362 (1991)]

2. **Evidence and Witnesses § 443 (NCI4th) — assault and robbery — out of court identification — photographic array — not unduly suggestive**

An out of court identification of defendant was not obtained by impermissibly suggestive procedures, although defendant contended that the first array fixed defendant's photograph in the witness's mind, where the witness first viewed an older photograph of defendant and thought it closely resembled the man she saw near the scene of the crime; the witness could make a positive identification only upon seeing a recent photograph; and she explained on cross-examination that she did not know she had seen two photographs of the same person and that her in-court identification was based on what she saw on the day of the crime.

**Am Jur 2d, Evidence §§ 371, 371.8.**

**Admissibility of evidence of photographic identification as affected by allegedly suggestive identification procedures. 39 ALR3d 1000.**

3. **Evidence and Witnesses § 1730 (NCI4th) — assault and robbery — reenactment — videotape admissible**

The trial court did not err in a prosecution for assault and robbery by admitting a videotape showing a reenactment of a witness's sighting of defendant shortly after the crime. The basic principles governing the admissibility of photographs apply to motion pictures; videotape recordings may be admitted into evidence where they are relevant and have been properly authenticated. These videotapes did not have the capacity to evoke a strong emotional reaction from a jury, did not present the jury with such a powerful visual image that they completely usurped the witness, and did not depict any conduct, incriminating or otherwise, of defendant.

**Am Jur 2d, Evidence §§ 795, 833.**

**Admissibility of evidence of accused's re-enactment of crime. 100 ALR2d 1257.**

4. **Criminal Law § 425 (NCI4th) — assault and robbery — closing arguments — comment on defendant's failure to call witness — erroneous statement of evidence — no error**

There was no error in a prosecution for assault and robbery from the prosecutor's closing argument that defendant

had elected not to call certain witnesses, including a person with whom defendant was seen on the day of the crime, but whom the prosecutor claimed was not identified until defense counsel's closing argument. That witness had, in fact, been identified by another defense witness who testified. The remarks here were directed to the failure of the defendant to produce exculpatory evidence rather than to his failure to testify on his own behalf, the prosecutor's error of fact was minor and not prejudicial, and the court carefully instructed the jurors that they were to decide the facts from all the evidence and apply the law to the facts as they alone found them.

**Am Jur 2d, Trial §§ 590, 592.**

**Adverse presumption or reference based on party's failure to produce or examine friend — modern cases. 79 ALR4th 779.**

APPEAL by defendant from judgment entered 26 May 1990 by *Judge A. M. Brannon* in DURHAM County Superior Court. Heard in the Court of Appeals 18 September 1991.

*Attorney General Lacy H. Thornburg, by Special Deputy Attorney General W. Dale Talbert, for the State.*

*Dean A. Shangler for defendant-appellant.*

PARKER, Judge.

Defendant was tried before a jury for attempted first degree rape, robbery with a dangerous weapon, assault with a deadly weapon with intent to kill inflicting serious injury, felonious breaking and entering, felonious larceny and possession of stolen goods. The jurors convicted defendant of robbery with a dangerous weapon, felonious breaking and entering, assault with a deadly weapon inflicting serious injury, felonious larceny of a motor vehicle, and felonious possession of a motor vehicle. Finding aggravating and mitigating factors, the trial court sentenced him to consecutive terms totalling seventy years of imprisonment and arrested judgment as to defendant's conviction of felonious possession of a motor vehicle.

[1] Defendant's three contentions on appeal relate solely to the guilt phase of his trial. Defendant brings forward forty-four assignments of error but in his brief mentions and presents arguments in support of only twenty-five of these. The other nine-

teen are, therefore, deemed abandoned. *See* N.C.R. App. P. 28(b)(5). Defendant first contends the court erred in denying his motion to suppress a witness' out of court and in court identifications of him in that (i) there was insufficient evidence to support fourteen of the trial court's findings of fact in the written order denying the motion to suppress or (ii) procedures used in the out of court identification were impermissibly suggestive and tainted the in court identification. We find these contentions to be without merit.

State's evidence tended to show that the victim vividly recalled what happened to her on 16 June 1989, when she returned home shortly before noon and was stabbed and robbed in her house on the corner of Markham and Washington Streets in Durham, North Carolina. She did not see her assailant's face because at first he remained behind her and later covered her head with a pillow case from her bed. From seeing his arm and hearing his voice, she knew that he was male and of African American descent; but she could not positively identify defendant's voice as that of her assailant. After her assailant took her car keys and attempted to drive away in her car, the victim heard the car stall three times.

Within minutes of the assault and robbery, Dorothea Jean Davis drove her 1978 Pontiac Bonneville automobile from Green Street onto Washington Street. At trial she testified that her friend Joyce Whitted was sitting in the front passenger seat of the Bonneville and the windows were down, but Davis could not recall if the radio was playing. When Davis turned onto Washington Street, she saw a car stopped in the street. Other cars were driving around the stopped car. The position of the stopped car forced other cars to cross into the oncoming traffic lane to pass by. As Davis drove her car around the stopped car, she could see into the driver's side. She saw an African American man. Defense counsel objected to Davis' identifying defendant as the driver she saw, and a lengthy *voir dire* ensued.

On *voir dire*, Officer Eric Hester of the Durham Police Department testified that on the Friday following the date of the crime he and other officers conducted a door to door investigation in the Washington Street area, using fliers showing the victim's car. Hester approached two men in the 500 block of Green Street, and one of them led him to Davis. Davis then told Hester she had seen a "Crime Stoppers" bulletin on television which included a photograph of a car that she recognized. She stated further that

on first seeing the actual stopped car she became angry; and as she drove by it, she looked at the driver and said, "If you don't know how to drive a stick, get out of the street." In a statement signed on Friday, 23 June 1989, she said the driver was an African American man with a baby face and short cropped hair that looked like it was messed up in the front.

The same afternoon, Davis worked with technician Allison Hudgins on a composite sketch of the driver. Since Davis and Hester were unsatisfied with this sketch, Hester called in a free lance artist. The artist's sketch was published the following Monday, 26 June, and the next day, Hester received additional information about the crime. Hester testified further that he went to Davis' residence and asked her to look at an array of photographs. He showed Davis photographs of six men; one photograph had been taken of defendant several years earlier. Upon seeing defendant's photograph, Davis stated, "It looks real close. The hair is right. It looks messed up. The complexion is right, but he is just not full enough in the lower facial area, mainly the chin area."

On 28 June, Hester showed Davis another photographic array at the police station. Again, there were six photographs, including one photograph of defendant made only a day or two before the second viewing. Defendant was the only subject whose photograph was in both arrays. Davis picked out the photograph of defendant. Hester testified that only after Davis picked out defendant's photograph from the second array did he tell Davis the two arrays had included different photographs of the same person.

On *voir dire*, Davis' testimony on direct examination essentially corroborated Hester's account of the circumstances surrounding her viewing of the arrays. On cross-examination, using the court reporter for purposes of illustration, Davis demonstrated how she had turned and spoken to the defendant. In addition, with respect to the second viewing, the following colloquy took place:

Q. Now, after you picked that picture out, did you say anything to Detective Hester?

A. I told him that I felt sure about that picture.

Q. Did you go on to say to him that you were concerned about anything?

A. Not that I can recall. No.

Q. Did you think of the first line-up at all while you were looking at the second line-up?

A. Yes.

Q. You had been thinking about both of them, weren't you?

A. In a way, yes, because at the first line-up I felt like I was looking at one picture and he was similar to the guy, but, you know, it wasn't him, and then on the second pictures I felt sure about this, but I did not know then that it was the same person, but I had felt concern about it.

Q. Did it help you [to] see the picture two times to be sure?

A. No, because I didn't know that the picture . . . . [I]n other words, [at] the first line-up I didn't feel certain about it. [At] the second one I did.

Q. I'm not clear why Detective Hester thought you were concerned?

A. I guess it was because I told him that in the first line-up I felt that this could be the guy, but I could not make a positive identification of the guy.

Q. Were you worried that you were picking the wrong person, is that what you mean?

A. No.

Q. Now, you testified in here during this examination that the person that you saw driving the car was my client, is. that correct?

A. That's correct.

Q. Isn't it true that you're saying it's him in here, because you have seen the pictures and all?

A. No. Well, I have seen the pictures, but that's the guy I seen [sic].

Q. [S]eeing the pictures helped you make that clear in your mind?

A. Possibly.

Defendant presented no evidence at the *voir dire*. At the close of the hearing, the trial court denied defendant's motion to suppress the out of court and in court identifications. Signed 19 October

1989, the order denying the motion to suppress includes forty-one numbered findings of fact.

We have carefully reviewed each of defendant's arguments with respect to whether the evidence at the hearing was insufficient to support the fourteen challenged findings. We are satisfied that with respect to every significant challenge, the record shows there was sufficient evidence to support the finding. Defendant concedes that only if the evidence was insufficient did the trial court err as to its conclusion of law that the motion to suppress should be denied. *See* 1 H. Brandis, *Brandis on North Carolina Evidence* § 19a (3d ed. 1988) (finding of fact supported by competent evidence is ordinarily conclusive but whether the findings support the conclusion denying motion to suppress is a question of law). We, therefore, conclude that with respect to the issue of sufficiency of the evidence, the trial court did not err in denying defendant's motion to suppress.

[2] "Due process forbids an out-of-court confrontation which is so unnecessarily 'suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *State v. Leggett*, 305 N.C. 213, 220, 287 S.E.2d 832, 837 (1982) (quoting *Simmons v. United States*, 390 U.S. 377, 384, 19 L.Ed.2d 1247, 1253 (1968)). As *Leggett* reiterated,

> "The test under the due process clause as to pretrial identification procedures is whether the totality of the circumstances reveals pretrial procedures so unnecessarily suggestive and conducive to irreparable mistaken identification as to offend fundamental standards of decency, fairness and justice." *State v. Henderson*, 285 N.C. 1, 9, 203 S.E.2d 10, 16 (1974), *death penalty vacated*, 428 U.S. 902, 49 L.Ed.2d 1205, 96 S.Ct. 3202 (1976). In evaluating such claims of denial of due process, this Court employs a two-step process. First, we must determine whether an impermissibly suggestive procedure was used in obtaining the out-of-court identification. If this question is answered in the negative, we need inquire no further. If it is answered affirmatively, the second inquiry we must make is whether, under all the circumstances, the suggestive procedures employed gave rise to a substantial likelihood of irreparable misidentification. *State v. Headen*, 295 N.C. 437, 439, 245 S.E.2d 706, 708 (1978).

*Leggett*, 305 N.C. at 220, 287 S.E.2d at 837.

Defendant argues that the procedure of showing Davis the two arrays was impermissibly suggestive because viewing defendant's photograph in the first array fixed it in Davis' mind. We disagree.

In *Leggett*, the defendant was the only person whose photograph was in both arrays shown to the victim. The Court stated, "[T]hat a defendant's photograph is the only one common to two groups of photographs shown a victim is not sufficient, standing alone, to support a determination that pretrial photographic identification was conducted in an impermissibly suggestive manner. The totality of the procedures employed . . . here clearly indicates that the procedures were not impermissibly suggestive." *Id*. at 222, 287 S.E.2d at 838. The Court went on to hold the trial court had not erred in admitting "testimony and other evidence, through the victim and the officer conducting the procedures, concerning these photographic identifications of the defendant by the victim." *Id*.

On the issue of impermissibly suggestive identification techniques, the case under review differs on its facts from *Leggett* in only one respect. In *Leggett*, the victim positively identified the defendant's photograph in both arrays. We are not convinced that this factual difference works to the advantage of defendant Billings, but assuming it does so, the evidence on *voir dire* showed that Davis first viewed an older photograph of defendant and thought it closely resembled the man she saw near the scene of the crime. However, only upon seeing a recent photograph could she make a positive identification. Her inability to make a positive identification from the older photograph was coupled with her explanation on cross-examination that she did not know she had seen two photographs of the same person and that although she had viewed the two arrays, her in court identification was based on what she saw on the day of the crime. As in *Leggett*, all the photographs were of African American males and no suggestion was made to Davis that she pick any of the photographs. In addition, all the subjects were similar in age and physical stature, and the photographs were otherwise marked only by numbers written on the reverse side. Under all the circumstances, we conclude that the totality of the procedures employed shows they were not impermissibly suggestive. Having concluded that the procedures used in obtaining Davis' out-of-court identification were not impermissibly suggestive, we need not consider whether the procedures gave rise to a substantial likelihood of irreparable misidentification. We

hold that because the procedures were not impermissibly suggestive, the trial court did not err in denying the motion to suppress Davis' identifications of defendant.

[3] Defendant's second contention is that the court erred in admitting videotape recordings to illustrate Davis' testimony. We find this contention to be without merit.

During the lengthy *voir dire* described above, defendant also objected to the admission of videotapes to illustrate Davis' testimony. The evidence of witnesses Hester and Davis established that Davis assisted police officers in preparing two videotapes purporting to re-enact her conduct on Washington Street on the day of the crime. The actual car belonging to the victim was used; from her memory Davis instructed the officers where it should be sited on Washington Street. In one tape, the camera operator stood on the corner of Green and Washington Streets and filmed Davis making a right turn from Green Street onto Washington Street and driving her 1978 Pontiac Bonneville around the stopped car on Washington Street. In the other tape, the camera operator sat in the back seat of the car as Davis drove the same route. The car windows were rolled down, but the radio was not playing. Detective Hester sat in the front seat to simulate the presence of Davis' friend, Joyce Whitted, but no one talked to simulate conversation between Davis and Whitted.

On cross-examination during the *voir dire*, Davis stated that to the extent the videotape indicated she came to a complete stop beside the victim's car, it was not entirely accurate. Nevertheless, all her testimony made clear that she drove very slowly and turned and spoke directly to the defendant, thus viewing his face.

Immediately after argument on the issue of admissibility of Davis' identifications of defendant, the following colloquy took place:

MR. SHANGLER: Judge, one more matter as to the video tape. I would like to raise the issue of whether or not that itself would be admissible at this trial even though it illustrates the evidence, because I feel that the prejudicial value outweighs the probative value.

COURT: 403 argument, right?

MR. SHANGLER: Yes, sir, and the basis is her testimony as to what really it lacked in terms of presenting it and the

fact, as your Honor knows, she speaks quite well from the stand and can get across what her testimony is.

The North Carolina Supreme Court has held that the basic principles governing the admissibility of photographs apply also to motion pictures. Videotape recordings may be admitted into evidence where they are relevant and have been properly authenticated. *See State v. Strickland*, 276 N.C. 253, 258, 173 S.E.2d 129, 132 (1970). Such evidence may be admitted to illustrate the testimony of a witness or as substantive evidence. N.C.G.S. § 8-97 (1986). Where a videotape depicts conduct of a defendant in a criminal case, its potential impact requires the trial judge to inquire "carefully into its authenticity, relevancy, and competency, and—if he finds it to be competent—to give the jury proper limiting instructions at the time it is introduced." *State v. Strickland*, 276 N.C. at 262, 173 S.E.2d at 135. Under such circumstances, the trial judge should grant a request from the defense to preview the tape. Moreover, if a videotape contains incriminating statements by the defendant, upon his objection, the judge must conduct a *voir dire* to determine the admissibility of any in-custody statements or admissions in the tape. *See id.*

As shown above, defendant's argument at *voir dire* was merely that probative value of the tapes was outweighed by their prejudicial value. Before this Court, defendant also argues that the videotape re-enactments of Davis' actions were not substantially similar to the actual events they purported to depict.

According to the Rules of Evidence, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1988). In this context, unfair prejudice means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, on an emotional basis. N.C.G.S. § 8C-1, Rule 403 commentary (1988); *State v. DeLeonardo*, 315 N.C. 762, 772, 340 S.E.2d 350, 357 (1986). More importantly, whether to exclude evidence under Rule 403 is a matter within the sound discretion of the trial court, whose ruling may be reversed for abuse of discretion only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision. *State*

v. *Mason*, 315 N.C. 724, 731, 340 S.E.2d 430, 435 (1986); *State v. Jones*, 89 N.C. App. 584, 594, 367 S.E.2d 139, 145 (1988).

From viewing the videotapes, we are not persuaded that they have the capacity to evoke a strong emotional reaction from a jury. Further, we are not persuaded by defendant's argument that the tapes in and of themselves presented the jury with such a powerful visual image that they completely usurped Davis' role as eyewitness. Defendant does not show how the court's decision to admit the tapes was so arbitrary that it could not have been the result of a reasoned decision. Moreover, our viewing of the tapes does not convince us the trial court's decision could not have been the result of a reasoned decision. As shown above, the tapes did not depict any conduct, incriminating or otherwise, of the defendant. For all these reasons, we hold the trial court did not err in denying defendant's motion to exclude the tapes.

[4] Finally defendant contends the court erred in overruling his objection to the prosecutor's closing argument in that it included an error of fact and constituted improper comment on the defendant's failure to testify. Again, we disagree.

The challenged argument is as follows:

And so, quite frankly, [defendant] knows where he was. He knows who was with him during the course of that day what he did and if anyone was, and what anyone else did during the course of that day, and he has elected to give you some information, including, I would contend to you, giving you other information.

. . . .

He knows what happened that day and what has he presented to you about that day. You know, it's amazing, and you remember [State's witness] Mrs. Moore's testimony when she was on the witness stand. She saw him that day earlier in the afternoon, sometime after lunch with a young black male and she didn't know what his name was and then she saw him later that evening with the same person in the Volkswagen and she didn't know what his name was. Earlier they came up in a black vehicle, I believe she said, and she didn't know what his name was.

Nowhere during the course of this investigation do we know what his name was, or who that person was or anything

about that person until finally arguments this morning after all the evidence is in and we are talking to you about what has been presented and then it comes out in final arguments this morning to you through counsel who this person was. So obviously, somebody, not Mrs. Moore, but somebody knew who this person was, because that came out to you this morning in final arguments and that person's name evidently was Joe Perry. Mrs. Moore never said Joe Perry. She just said a young black male. I've seen him over there before. I didn't know who he was. I didn't know his name.

This morning for the first time after all the evidence, hey, Joe Perry.

DEFENSE COUNSEL: OBJECTION

COURT: LET ME GET YOU TO COME HERE FOR A SECOND.

(BENCH CONFERENCE)

COURT: OBJECTION OVERRULED.

The prosecutor continued, without any further objection, by noting which witnesses had testified for the defense and that defendant had elected not to call certain witnesses, including Perry. However, the record shows defense witness Tim Anderson in fact testified that on the day of the alleged crime, defendant came to Anderson's house in the company of Joe Perry, also known as Joe Bird. Thus the prosecutor's argument that the jury never heard Perry's name until closing arguments constitutes an error of fact.

According to the North Carolina Supreme Court

It is the duty of the prosecuting attorney to present the State's case with earnestness and vigor and to use every legitimate means to bring about a just conviction. In the discharge of that duty, he should not be so restricted as to discourage a vigorous presentation of the State's case to the jury.

We have held in numerous cases that argument of counsel must be left largely to the control and discretion of the presiding judge and that counsel must be allowed wide latitude in the argument of hotly contested cases. Counsel for both sides are entitled to argue to the jury the law and the facts in evidence and all reasonable inferences to be drawn therefrom. Language

may be used *consistent with the facts in evidence* to present each side of the case.

. . . .

. . . The trial court has a duty, upon objection, to censor remarks not warranted by either the evidence or the law . . . . If the impropriety is gross it is proper for the court even in the absence of objection to correct the abuse *ex mero motu.*

*State v. Monk*, 286 N.C. 509, 515-16, 212 S.E.2d 125, 130-31 (1975) (citations omitted, emphasis in original). Nevertheless, minor transgressions are cured by the mere sustaining of an opponent's objection. *Id.* at 516, 212 S.E.2d at 131.

Defendant also argues that "what is more serious is that the intended inference of this part of the prosecutor's argument is that the defendant, who knows what he did or didn't do on June 16, 1989, did not testify from the stand that he was with Joe Perry." We do not find this argument persuasive.

A prosecutor's argument which suggests in unmistakable terms that a defendant has failed to testify

violates the rule that counsel may not comment upon the failure of a defendant in a criminal prosecution to testify. This is forbidden by [N.C.G.S. §] 8-54 (1969). *See State v. Roberts*, 243 N.C. 619, 91 S.E.2d 589 (1956); *State v. McLamb*, 235 N.C. 251, 69 S.E.2d 537 (1952); *State v. Farrell*, 223 N.C. 804, 28 S.E.2d 560 (1944).

*State v. Monk*, 286 N.C. at 516, 212 S.E.2d at 131. Nevertheless, improper comment on a defendant's failure to testify is curable by the court's immediately instructing that (i) the argument is improper and (ii) the jury is to disregard it. However, improper comment is not cured by subsequent inclusion in the general charge of an instruction on a defendant's right to choose whether to testify. *Id.* at 516-17, 212 S.E.2d at 131-32; 1 H. Brandis, *Brandis on North Carolina Evidence* § 56 (3d ed. 1988). We, therefore, explicitly reject State's argument that as a matter of law, a general instruction on the defendant's right to choose whether to testify effects such a cure.

Notwithstanding the prohibition against commenting on a defendant's failure to testify, latitude to present the State's case

vigorously comprehends the prosecutor's right to argue to the jury "a 'defendant's failure to produce exculpatory evidence or to contradict evidence presented by the State.'" *State v. Mason*, 315 N.C. at 732, 340 S.E.2d at 436 (quoting *State v. Jordan*, 305 N.C. 274, 280, 287 S.E.2d 827, 831 (1982)). *See also* 1 H. Brandis, *supra*, at 264 ("statute does not forbid comment by the prosecutor on the defendant's failure to prove specified facts, or to contradict the testimony of State witnesses, or to call or examine certain witnesses"). Since such remarks do not constitute error, they do not require cure by the trial court.

Applying the principles set out above, we conclude that the prosecutor's remarks, being directed to the failure of the defendant to produce exculpatory evidence, rather than to his failure to testify in his own behalf, were not improper. The court, therefore, did not err in overruling defendant's objection if premised on such impropriety. We also conclude the prosecutor's error of fact was minor and not prejudicial. The court in its charge carefully instructed the jurors that they were to decide from all the evidence what the facts actually were and apply the law to the facts as they, and they alone, found them to be. Under these circumstances we are unable to find the court abused its discretionary power to control arguments to the jury. We, therefore, hold that the trial court did not err in overruling defendant's objection if premised on the prosecutor's error of fact.

No error.

Judges JOHNSON and EAGLES concur.