STATE OF NORTH CAROLINA v. DARYL KENT MASON

No. COA99-1629

(Filed 5 June 2001)

**1. Evidence— videotape—insufficient foundation—not prejudicial**

The admission of a store security videotape in an armed robbery prosecution was harmless error where the State did not establish a proper foundation for its admissibility in that the evidence was insufficient to establish that the system was properly functioning on the date of the robbery, the testimony was insufficient to establish that the tape accurately represented the events it purported to show, and the chain of custody was not adequately established, but there was other evidence providing a substantial basis for the jury's verdict.

**2. Evidence— cross-examination—audiotape not allowed— not prejudicial**

The trial court neither abused its discretion nor coerced defendant into presenting evidence in a prosecution for the armed robbery of a store by refusing to allow defendant to cross-examine an employee with a tape recording of her 911 call. The judge merely ruled against the use of an audiotape and did not prevent defendant from exploring this avenue of inquiry; furthermore, defendant was permitted to introduce the tape during his case in chief.

## 3. Criminal Law— prosecutor's argument—curative instruction

The trial court did not err in an armed robbery prosecution by not granting a mistrial where defendant objected to the prosecutor's argument concerning defendant's failure to present evidence to rebut the State's case, the court sustained the objection, and the court directed the jury "not to consider that." Any error was sufficiently cured by the court's instructions.

Judge WALKER concurring in the result.

Appeal by defendant from judgment entered 18 December 1998 by Judge Donald W. Stephens in Durham County Superior Court. Heard in the Court of Appeals 14 February 2001.

*Attorney General Michael F. Easley, by Assistant Attorney General E. Clementine Peterson, for the State.*

*Mark J. Simeon, for the defendant-appellant.*

BIGGS, Judge.

Daryl Kent Mason (defendant) appeals from a judgment entered 18 December 1998, following his conviction of robbery with a dangerous weapon. We find error in the admission at trial of a videotape, but hold that the error was harmless on the facts of this case. Accordingly, we affirm the conviction and judgment below.

The defendant was tried for the armed robbery of an Eckerd drugstore located in Durham. The evidence presented at trial is summarized as follows: On the night of 7 January 1998, Camella Carter (Carter), Tonya Dickerson (Dickerson), and Vicki Perez (Perez) all were employed at Eckerd's store. The defendant was a former Eckerd's employee who had recently stopped working there. At approximately 11:30 or 11:45 P.M., shortly before the store closed at midnight, the defendant came into Eckerd's and spoke with Carter. He asked her who else was working that night, and asked for change to buy a candy bar. He was wearing a white nylon 'windbreaker' jacket over a black sweatshirt. After speaking with the defendant, Carter resumed her duties, and the defendant walked to the front cash register, which was operated by Dickerson. A few minutes after the store closed, Carter heard Dickerson scream, followed by another person shouting "[s]hut up!" She looked up from her work, saw the

defendant with a gun pointed at Perez, and heard him say "[t]his is a robbery." Although the robber was masked, Carter recognized the defendant by his clothes—a black sweatshirt and white pants that matched the windbreaker she had noticed him wearing a few minutes earlier. The defendant demanded money from Perez, and led her toward the front of the store. Camella ran to a storage room, where she hid during the rest of the incident. She saw nothing more; however, a few minutes later, she heard someone opening and shutting the back door to the store, then throwing what sounded like keys onto the floor. Carter testified that no one used the back door except employees, and also that she had not seen the defendant leave the store before closing. She was certain of her identification of defendant as the person who had robbed Eckerd's.

Dickerson testified that she had worked with the defendant at two different stores: at Eckerd's, and also at a nearby Food Lion grocery. On 7 January 1998, the defendant came into Eckerd's just before closing and asked Dickerson who else was working that evening. He mentioned buying a candy bar, but he never purchased anything. Dickerson noticed that he wore a white windbreaker; she could not see his pants from behind her cash register. She did not see him leave the store before it closed. After their conversation, Dickerson returned to work. A few minutes after the store closed, Dickerson felt a tap on the shoulder. When she turned around, she saw two masked men with guns and began screaming. She recognized the defendant's voice when one of the men yelled "[s]hut up Tonya!" The defendant left her with his accomplice, while he went toward the cash register operated by Perez. Dickerson could not see Perez's part of the store, but in a few minutes the defendant returned to the area near her cash register, holding a clear plastic trash bag filled with cash. Dickerson was certain that the defendant was one of the two who robbed the store: she recognized his voice, and also his white nylon pants matched the jacket he was wearing when he spoke with her shortly before the robbery. After taking money from several cash boxes in the store, the robbers demanded the keys to the employees' back door. They ordered Carter, Dickerson, and Perez into the ladies' room, and then fled from the store. Neither Carter nor Dickerson recognized the second gunman.

When the State sought to introduce a store surveillance videotape at trial, the defendant objected, and a voir dire was conducted on the tape's admissibility. The trial court allowed the admission of the videotape. On appeal to this Court, the defendant assigns error to its

STATE v. MASON

[144 N.C. App. 20 (2001)]

admission, arguing that the State failed to establish an adequate foundation for its admissibility.

Evidence presented at trial during the voir dire showed the following: Neither Carter nor Perez testified on voir dire. Dickerson testified on voir dire that Eckerd's was using a store security camera system on 7 January 1998. As far as she knew, it was operating properly that night. However, she had no information about maintenance, testing, or operation of the machine, had never tested it, and did not know the brand or model of the recording device. She had not played any part in making the recording that evening, as that was the responsibility of Perez, who was evening manager. The night that the store was robbed, Dickerson saw Perez handing a videotape to a police officer, but did not know his name. At some point after the robbery, Dickerson viewed a tape in which she was shown speaking with the defendant in Eckerd's. It also appeared to show the defendant robbing Perez at gunpoint. However, from her location in the store, Dickerson had been unable to see Perez during the robbery, so she had not seen the defendant rob Perez or demand money from her. Thus, she could not attest to the accuracy of the videotaped robbery scenes, although she could state that the segments of tape in which she was present appeared to be accurately videotaped.

Dan Merit, Eckerd's general manager, testified that Eckerd's security system had eight cameras that could be programmed to videotape various locations in the store. The system also included a VCR, and a separate machine that controlled which cameras would record at any given time. He described the employees' procedure for operating the system as "basically what you do is you put the tape in, you hit the record button, you see whether the record light comes on." He was not in the store during the robbery, or when the tape was given the police. Merit had no reason to believe that the system was malfunctioning on 8 January 1998. However, he did not keep any records on the maintenance or testing of the system, and he had not checked the tapes made during the days immediately before and after the robbery to assess whether the system was properly functioning. Further, Merit testified that the store system "is a preprogrammed time-lapse VCR recorder and I am not technically minded enough to tell you how the doggone thing works," and that "I truthfully don't know how the thing works." At some point in the six months following the robbery, the VCR had broken and was replaced.

Officer Pitt of the Durham City Police testified that he had retrieved a videotape from the police evidence locker several days

after the robbery. He recalled that the tape's label indicated that it came from the store; however, he had not been at Eckerd's the night of the robbery, and was not the officer who had obtained custody of the tape. Officer Marsh, another Durham police officer, testified that he had been at Eckerd's on the night of the robbery. He had summoned an identification technician to retrieve the tape and other physical evidence, but he had not touched the tape himself, or taken custody of it. The tape was shown on voir dire, and Dickerson testified to the accuracy of the portion of the tape that showed her conversation with the defendant before the robbery. Following the voir dire hearing, the trial court denied the defendant's suppression motion, and ruled that the tape was admissible as substantive evidence. The videotape was then shown to the jury over defendant's objection. Dickerson attested to the accuracy of the segments of tape in which she was present. Due to the nature of the Eckerd's photo surveillance system, the events depicted on the tape would appear at an unnaturally fast speed when the tape was shown on a conventional VCR. To avoid this 'fast-action' playback, the court directed the prosecutor to play the tape on the VCR's 'slow motion' setting. However, after a few minutes on slow motion, the tape would automatically revert to high speed until Officer Pitt could stop the tape and restart it in slow motion. This resulted in intermittent "gaps" of approximately 30 seconds.

After the tape was played, the jury heard testimony by Officers March and Pitt of the Durham police force, concerning their investigation of the case. Marsh was at Eckerd's the night of the robbery to interview witnesses and secure the scene; and Pitt conducted the subsequent investigation. The identification technician who had retrieved the tape the night of the robbery did not testify at trial; nor did Perez, the cashier who was shown being robbed on the videotape.

[1] The general rule is that the admissibility of a videotape is governed by the same rules that apply to still photographs. *State v. Strickland*, 276 N.C. 253, 173 S.E.2d 129 (1970) (upholding admission of film of driver charged with DWI, taken after his arrest). Upon a proper foundation, videotapes, like photographs, are admissible at trial for either illustrative or substantive purposes:

> Any party may introduce a photograph, video tape, motion picture, X-ray or other photographic representation as substantive evidence upon laying a proper foundation and meeting other applicable evidentiary requirements. This section does not pro-

hibit a party from introducing a photograph or other pictorial representation solely for the purpose of illustrating the testimony of a witness.

N.C.G.S. § 8-97 (1999). In the present case, the store surveillance tape was admitted for substantive purposes. This Court has noted that when "a videotape depicts conduct of a defendant in a criminal case, its potential impact requires the trial judge to inquire 'carefully into its authenticity, relevancy, and competency[.]' " *State v. Billings*, 104 N.C. App. 362, 371, 409 S.E.2d 707, 712 (1991) (citation omitted). The standard for the admission of a videotape was articulated in *State v. Cannon*, 92 N.C. App. 246, 374 S.E.2d 604 (1988), *rev'd on other grounds*, 326 N.C. 37, 387 S.E.2d 450 (1990), in which this Court stated:

> The prerequisite that the offeror lay a proper foundation for the videotape can be met by: (1) testimony that the motion picture or videotape fairly and accurately illustrates the events filmed, (illustrative purposes); (2) 'proper testimony concerning the checking and operation of the video camera and the chain of evidence concerning the videotape;' (3) testimony that 'the photographs introduced at trial were the same as those [the witness] had inspected immediately after processing' (substantive purposes); or (4) 'testimony that the videotape had not been edited, and that the picture fairly and accurately recorded the actual appearance of the area photographed.'

*Id.* at 254, 374 S.E.2d at 609 (citations omitted). In *Cannon* the proponent of the videotape at issue offered testimony from a witness who had seen the filmed events when they occurred, attesting to the videotape's accuracy; testimony that the machine had been installed just six weeks earlier and was working properly on the night of the offense; and testimony from a law enforcement officer that he had maintained exclusive custody of the film since the night of the robbery.

The *Cannon* standard has been followed in subsequent cases addressing the foundation required before a videotape may properly be admitted into evidence. In *State v. Mewborn*, 131 N.C. App. 495, 507 S.E.2d 906 (1998), the defendant challenged the admission of a videotape of the armed robbery of a store. The State offered testimony from a store employee that the VCR was working properly on the day of the offense. Other testimony by a law enforcement officer who had viewed the tape immediately after the incident, and by the

officer who had assumed custody of the tape shortly after the incident and had viewed it that night, established that the tape was in the same condition and depicted the same events as on the night of the robbery. This Court held that, taken together, the testimony of the three witnesses was sufficient to "satisfy the test enunciated in *Cannon.*" *Id.* at 499, 507 S.E.2d at 909.

This Court recently applied the same test to a situation in which the foundation was insufficient. In *State v. Sibley,* 140 N.C. App. 584, 537 S.E.2d 835 (2000), the defendant was arrested along with several others, at a house that was not his residence, and subsequently was charged with possession of a firearm by a convicted felon and possession of cocaine. The defendant objected to the admission at trial of a videotape seized from the premises that showed the defendant holding weapons similar to those found in the house. Testimony at trial established an unbroken chain of custody. However, the State did not call any witnesses to testify that the camera was operating properly, or that the videotape accurately presented the events that were filmed. This Court applied the *Cannon* test in its inquiry into the videotapes' admissibility. It held that the videotapes were not properly authenticated, and thus were inadmissible.

We evaluate the admissibility of the videotape offered in the instant case against the backdrop of *Cannon, Mewborn,* and *Sibley.* These cases define three significant areas of inquiry for a court reviewing the foundation for admissibility of a videotape: (1) whether the camera and taping system in question were properly maintained and were properly operating when the tape was made, (2) whether the videotape accurately presents the events depicted, and (3) whether there is an unbroken chain of custody. In the instant case, the evidence was deficient in each of these areas.

Two of the State's witnesses, Dickerson and Merit, were asked about the surveillance system, and both expressed the opinion that it was in working order. However, neither one knew anything about the maintenance or operation of the camera system. Dickerson testified that she could not even operate her home VCR, but relied upon her husband; Merit candidly admitted that he did not know "how the doggone thing works" and did not conduct the recommended inspection or maintenance of the camera or monitors. Some time after the robbery, the VCR had malfunctioned, and was replaced. None of the State's witnesses gave testimony to indicate that there was any routine maintenance or testing of the Eckerd's security system. Nor was there testimony from any witness that the tapes made on days imme-

diately preceding and following the robbery had been examined. The evidence presented at trial was insufficient to establish that the store security system was properly functioning on 8 January 1998.

The trial testimony also was insufficient to establish that the tape accurately represented the events it purported to show. The tape included segments of routine activity in the store, including a conversation between Dickerson and the defendant before Eckerd's closed. It also depicted someone robbing a woman identified by other witnesses as a cashier named Vicki Perez. However, Ms. Perez did not testify at trial, so there was no testimony attesting to the accuracy of this crucial part of the tape. Although Dickerson could identify the segment of tape showing her in conversation with the defendant, the more significant part of the tape was never authenticated.

Additionally, the chain of custody was not adequately established. Testimony indicated that Perez had given the tape to a law enforcement officer on the night of the offense. However, neither Perez nor that officer appeared at trial. No testimony was presented from any witness who had handled the tape on 8 January 1998. In fact, the evidence on chain of custody began chronologically with Officer Pitt, who did not get the videotape from a police locker until several days after the robbery at Eckerd's.

Defendant argues further that the videotape should not be allowed because of the incompatibility of the equipment used to record the videotape and that used in the courtroom for playback, in that it created 30 second intervals. We find it unnecessary to address this argument in view of our discussion herein.

For the reasons discussed, we find that the State failed to sufficiently authenticate the contents of the videotape, or to establish an unbroken chain of custody, or to show that the store security system was properly functioning on the day of the robbery. The evidence presented at trial concerning the videotape did not lay a proper foundation for its admissibility, and thus it was error to admit the videotape.

However, not all trial errors require reversal. The error must be material and prejudicial. *State v. Alston*, 307 N.C. 321, 298 S.E.2d 631 (1983) (admission of irrelevant evidence held not prejudicial on facts of case). An error is not prejudicial unless "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial[.]" N.C.G.S. § 15A-1443(a)

(1999). Where it does not appear that the erroneous admission of evidence played a pivotal role in determining the outcome of the trial, the error is harmless. *State v. Francis*, 343 N.C. 436, 471 S.E.2d 348 (1996) (trial court's error in admitting witness's statement held harmless where defendant showed no likelihood of different result had statement been excluded); *State v. Fluker*, 139 N.C. App. 768, 535 S.E.2d 68 (2000) (error not grounds for reversal where there is no reasonable possibility that, absent the error, the trial would have had a different result). On the other hand, the erroneous admission of evidence is reversible if it appears reasonably possible that the jury would have reached a different verdict without the challenged evidence. *State v. Grover*, 142 N.C. App. 411, 543 S.E.2d 179 (2001) (erroneous admission of expert testimony in child sex abuse case held reversible error on facts of case). The defendant bears the burden of showing that he was prejudiced by the admission of the evidence. *State v. Wingard*, 317 N.C. 590, 346 S.E.2d 638 (1986).

In the present case, there was substantial evidence of the defendant's guilt. The state presented testimony from two eyewitnesses, Carter and Dickerson, both of whom confidently identified the defendant as one of the men who had robbed Eckerd's. Both had been employed at Eckerd's with the defendant, and Tonya Dickerson had also worked with him at a Food Lion grocery. This is consistent with testimony that the robber had yelled "[s]hut up Tonya!" when Dickerson shouted. The defendant's behavior before the robbery was inherently suspicious: coming into the store shortly before closing without buying anything, and asking two different clerks for the names of other employees on duty that night. Both Carter and Dickerson had noticed the defendant's white nylon jacket during their conversations with him during store hours, and both noticed that the robber wore a matching pair of pants. Additionally, the robber appeared familiar with store procedures; he asked for the keys to the back door, which was used only by employees and was not visible to the public. Taken together, this evidence provides a substantial basis for the jury's verdict.

We conclude that the defendant has not met his burden of showing that there is a reasonable possibility that a different verdict would have resulted from the exclusion of the videotape. We also have considered the defendant's other assignments of error pertaining to the replay of this videotape in response to a jury request, and find that any error was harmless. Accordingly, we hold that the admission at trial of the store videotape constituted harmless error.

**[2]** The defendant next assigns error to the trial court's refusal to allow him to cross examine Dickerson with a tape recording of a call she had made to the '911' operator. On direct examination, Dickerson testified that she had participated in the 911 call, and had given the emergency operator a description of the robber. However, she did not remember the details of this conversation. The defendant sought to cross-examine Dickerson with a tape recording of the call, in order to reveal inconsistencies between her trial testimony and what she had told the 911 operator. The trial judge ruled that the defendant could not play a tape recording on cross-examination, although he might introduce the tape during his case in chief.

The defendant correctly states the general rule that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C.G.S. § 8C-1, Rule 611 (b) (1999). Dickerson's prior statements to the 911 operator were relevant to the issue of the weight to accord her testimony. However, Rule 611 also provides that:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

Rule 611(a). "[T]he scope of cross-examination rests largely within the trial court's discretion and is not ground for reversal unless the cross-examination is shown to have improperly influenced the verdict." *State v. Parker*, 140 N.C. App. 169, 183, 539 S.E.2d 656, 666 (2000), *disc. review denied*, 353 N.C. 394, 547 S.E.2d 37 (2001) (citation omitted). In this case, the trial judge did not prevent the defendant from exploring this avenue of inquiry. The court merely ruled against the use of an audiotape for cross-examination. However, the defendant could have conducted his cross-examination about the 911 call by questioning the witness from a transcript of the call. Further, the defendant was permitted to introduce the tape during his case in chief. We hold that the court neither coerced the defendant into presenting evidence, nor abused its discretion. This assignment of error is overruled.

**[3]** Finally, the defendant assigns error to the trial court's refusal to declare a mistrial in response to certain comments of the prosecutor during his closing argument to the jury. In the closing argument, the

prosecutor made several references to the defendant's failure to present evidence to rebut the State's case. In addition, the prosecutor made the following statement:

> There is no evidence the defendant ever left the store. That's what the crux of the case is all about. That's what the defense should have presented you in the case. Anybody come in here from the defense to tell you as a witness that Daryl Mason left the store? If you were wrongly accused, don't you think that would be important to your defense? *I was not in that store.* (emphasis added)

The defendant objected to this statement. The trial judge sustained his objection, and directed the jury "not to consider that." Defendant contends the prosecutor's remarks were an improper comment on his failure to testify, and required the trial court to declare a mistrial. We disagree.

A defendant's right not to testify is guaranteed under the Fifth Amendment to the U.S. Constitution, applicable to the states by the Fourteenth Amendment, as well as by Article I, § 23 of the North Carolina Constitution. It is axiomatic that "[a] criminal defendant may not be compelled to testify, and any reference by the State regarding his failure to testify is violative of his constitutional right to remain silent." *State v. Baymon,* 336 N.C. 748, 758, 446 S.E.2d 1, 6 (1994) (citation omitted). Such comment should be "cured by a withdrawal of the remark or by a statement from the court that it was improper, followed by an instruction to the jury not to consider the failure of the accused to offer himself as a witness." *State v. Trull,* 349 N.C. 428, 453, 509 S.E.2d 178, 194 (1998). However, in its closing argument, the prosecutor may properly bring to the jury's attention the defendant's failure to produce exculpatory evidence, or to contradict evidence presented by the State. *State v. Parker,* 350 N.C. 411, 516 S.E.2d 106 (1999); *State v. Jordan,* 305 N.C. 274, 287 S.E.2d 827 (1982). Further, if challenged, the prosecutor's remarks should be examined in the context of the entire argument, and of the evidence presented at trial. *State v. Penland,* 343 N.C. 634, 472 S.E.2d 734 (1996). We have employed these principles in our consideration of the record, and find that the error, if any, was sufficiently cured by the trial judge's instructions, and that a mistrial was not required.

For the reasons discussed above, we conclude that there was no prejudicial error and that the defendant's conviction and judgment below should be affirmed.

**STATE v. MASON**

[144 N.C. App. 20 (2001)]

No error.

Judge SMITH concurs.

Judge WALKER concurring in the result with separate opinion.

WALKER, Judge, concurring in the result.

I would defer to the trial court's determination that a sufficient foundation had been established by the State to admit the videotape into evidence. The thrust of the defendant's argument relates to the playback of the videotape during the trial. In his brief, the defendant characterizes his argument in part as follows:

> Surveillance video recordings such as those at issue here are different from normal videotaping, however, because they involve the taking (and playback) of substantially fewer photographs and at a much different rate, so as to permit the use of less videotape to cover a longer period of time without the need to change videotape cassettes. Hence, 'time-lapse' videography.
>
> . . .
>
> At this trial, the state offered absolutely no evidence at trial to explain the time-lapse videography recording process or playback process, and no evidence which explained why the playback was so problematic. The state admits that the problem was with their use of the wrong machine, but they never cured the problem either. There can be no question but that the videotape playback was the heart and soul of the state's case, relying upon it to prove a negative, that the defendant never left the store.
>
> . . .
>
> The most telling evidence of the total lack of description of the process or system by which such a time-lapse videotape was produced, and the unmitigated absence of a showing that the process produced an accurate result came from the jury itself which, during deliberation, questioned the court about (1) the missing gaps of footage, and (2) which of the machines was faulty . . . .

Again, the trial court is in the best position to assess whether the playback of the videotape under the circumstances would aid the jury in its decision.