DIETZ, Judge.
After signing a written waiver of his Mirandarights, Defendant Travon Quantez Love confessed to police that he had engaged in numerous sex acts with his girlfriend's fifteen-year-old disabled daughter. The jury convicted Defendant of numerous sex offenses.
On appeal, Defendant argues that the trial court erred in denying his motion to suppress his written confession. He concedes that he was fully advised of his Mirandarights and that law enforcement "didn't technically run afoul of Miranda," but argues that the State violated his Fifth Amendment and statutory rights when police questioned him without first informing him that they already had obtained warrants for his arrest on the sex offense charges. Those warrants were based on other evidence in the case, including the detailed testimony of the juvenile victim and sexually explicit notes between Defendant and the victim discovered by the victim's mother.
We reject Defendant's constitutional claim. Under long-standing precedent from our Supreme Court, a criminal defendant need not be told that charges already have been brought against him in order for a waiver of his Fifth Amendment rights to be valid. Instead, as in all cases, the trial court must determine from the entire record whether the waiver was knowing, intelligent, and voluntary, which the court properly did in this case.
We likewise reject Defendant's statutory argument concerning law enforcement's obligation to inform a criminal defendant of the charges against him "as soon as possible." Any error on this statutory ground was harmless. The evidence against Defendant is overwhelming, including the detailed testimony of the juvenile victim describing the sex acts with Defendant, sexually explicit notes from Defendant to the victim, and other incriminating testimony from the victim's mother and doctor. Thus, Defendant failed to show a reasonable possibility that, had his confession been excluded, the jury would have reached a different result. Accordingly, we find no prejudicial error.
Facts and Procedural Background
K.L. was fifteen years old in the summer of 2011 when Defendant Travon Quantez Love engaged in oral sex with her and attempted vaginal intercourse. At the time, Defendant was twenty-four years old and had been in a tumultuous dating relationship with K.L.'s mother for three years. Defendant lived in the family home off-and-on since 2008, and he frequently stayed around the house that summer, raking leaves and doing other chores.
K.L. was born with spinal bifida and has difficulty with daily tasks such as managing her personal hygiene. She has bladder problems and has worn diapers all her life. K.L. can read and write, but she has difficulty with many activities that "normal kids" can do. Although she was fifteen in the summer of 2011, her maturity level was several years delayed.
Defendant's sexual contact with K.L. began when Defendant wrote a letter to K.L. asking if she "want[ed] to do anything" with him, "that can last a while and forget your mother." Defendant and K.L. began exchanging notes discussing sexual behavior. The first time Defendant and K.L. had physical contact was in June or July of 2011, when K.L. performed oral sex on Defendant in the living room of her home. At trial, K.L. testified that Defendant stood in front of her and she sucked his penis. The second time Defendant and K.L. had sexual contact, they engaged in oral sex in the victim's bedroom.
Also during the summer of 2011, Defendant attempted penetrative sex with K.L. by touching his penis to her "hole." At the time, K .L. was wearing her diaper, which she opened on one side. K.L. was "laying down and [Defendant] was standing in front of [her] with [her] legs over his shoulders." Defendant also touched K.L.'s breasts.
On 13 August 2011, K.L's mother discovered a note in the laundry with both K.L. and Defendant's handwriting on it. She could make out the words "have protection" written in her daughter's handwriting, as well as the word "asleep" in Defendant's handwriting. K.L.'s mother confronted Defendant and asked if he had had sex with K.L. Defendant denied the allegation and left the house.
That same day, K.L. told her mother "[t]hat [Defendant] did those things to me," and K.L.'s mother contacted police. The officers who responded to the call questioned K.L. and her mother, and they collected the note and K.L.'s bedding as possible evidence. A doctor examined K.L. at the hospital after K.L.'s mother reported the crime. K.L. told the doctor that Defendant touched her breasts and "tried to stick his penis" inside her vagina. She also told the doctor about the instances of oral sex.
Defendant returned to K.L.'s home two days later on 15 August 2011. At that time, he admitted to K.L.'s mother that he had written letters to K.L. asking to have sex, but he denied having any sexual contact with K.L. K.L.'s mother hit Defendant in the face and told him never to come back. The next day, she went to a magistrate and alleged that at 3:00 a.m. that morning, K.L. told her that someone had tried to open her bedroom window. She also reported that Defendant had been riding his bike in circles around the family's house. As a result of these allegations, Defendant was charged with second degree trespass and domestic criminal trespass. He was arrested and held in Scotland County jail, unable to make bond.
On 24 August 2011, K.L. spoke to Captain Kimothy Monroe with the Laurinburg Police Department about what happened between her and Defendant, signing a written statement. In the statement, K.L. indicated that she had been involved with Defendant for three months, that during that time she had twice engaged in oral sex with Defendant, that she and Defendant "had sex" in her bedroom on her bed, and that Defendant's penis touched her "hole" but "didn't go in." Based on these allegations, police obtained a warrant the morning of 26 August 2011 for Defendant's arrest on charges of indecent liberties with a child and statutory sex offense. The warrant was not printed at that time, but it was entered into the state database and the database for the National Crime Information Center.
Later that same day, Captain Monroe learned that Defendant was being held at the Scotland County jail and contacted Detective Jeremy White regarding the outstanding warrant. Following his conversation with Captain Monroe, Detective White went to the jail to speak with Defendant. After introducing himself, Detective White told Defendant that he wanted to talk about "the situation" between K.L. and Defendant. Detective White did not inform Defendant that he was under arrest or that a warrant already had issued for the sex charges.
Detective White read Defendant his Mirandarights from a preprinted form, and Defendant acknowledged his understanding, signing a written waiver of those rights. During his interview with Detective White, Defendant admitted to having sexual contact with K.L. Detective White typed Defendant's confession, and both he and Defendant signed the typed statement. In the statement, Defendant indicated that he and K.L. had exchanged letters discussing sex beginning in July 2011, that Defendant had touched K.L.'s breasts, that K.L. had manually stimulated Defendant one time and performed fellatio on him twice, that Defendant once rubbed his penis on K.L.'s back and buttocks, and that on 11 August 2011 Defendant put his penis in K.L.'s vagina one time and pulled it out.
After Defendant signed the statement, Detective White told him that there was an outstanding warrant for his arrest. Detective White then took Defendant to the magistrate's office, obtained a copy of the warrant, and advised Defendant of the charges against him.
Alleging various violations of his client's constitutional rights, Defendant's attorney filed a pre-trial motion to suppress the statement Defendant gave to Detective White. The trial court denied this motion, and the case proceeded before a jury. Defendant again objected to admission of the confession when the State called Detective White as a witness, and the trial court overruled the objection. The court later entered a detailed suppression order concluding that Defendant had knowingly, intelligently, and voluntarily waived his rights prior to making the statement.
After considering the testimony of the victim, her mother, investigating officers, the victim's doctor, and Defendant himself, the jury returned a verdict finding Defendant guilty of two counts of statutory sex offense, two counts of indecent liberties with a child, and one count of attempted statutory rape. The trial court sentenced Defendant to a total of 259 to 320 months imprisonment. Defendant gave notice of appeal in open court.
Analysis
A. Constitutionality of MirandaWaiver
Defendant first argues that the trial court erred in denying his motion to suppress because police obtained his confession in violation of his constitutional right to be free from self-incrimination. Our standard of review of an order granting or denying a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." State v. Cooke,306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). We review de novothe trial court's conclusions concerning the voluntariness of a defendant's confession. State v. Ortez,178 N.C.App. 236, 244, 631 S.E.2d 188, 195 (2006).
The Fifth Amendment to the United States Constitution prohibits compelling any person in a criminal case to be a witness against himself. U.S. Const. amend. V. In Miranda v. Arizona,384 U.S. 436 (1966), the United States Supreme Court held that in order to safeguard this right, police must inform a defendant, before any custodial interrogation, of the right to remain silent and to insist upon the presence of an attorney during questioning. Id.at 479. A defendant's waiver of these rights must be voluntary, meaning that it is the product of a free and deliberate choice rather than the result of intimidation, coercion, or deception. Moran v. Burbine,475 U.S. 412, 421 (1986). Such waiver also must be knowing and intelligent in the sense that it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id.However, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequenceof a waiver of the Fifth Amendment privilege." Colorado v. Spring,479 U.S. 564, 574 (1987) (emphasis added). Rather, "[t]he Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect." Id.
Defendant concedes that the investigating officer who took his confession "didn't technically run afoul of Miranda" and that he "did, in fact, advise [Defendant] of his rights." Nonetheless, Defendant argues that his waiver "was not made with full awareness" because "he was deprived of the knowledge that he was actually a defendant charged with serious sex crimes when he agreed to waive his rights and talk to Officer White. Only with this knowledge could he appreciate the consequences of his decision to abandon his rights."
Our Supreme Court rejected a criminal defendant's nearly identical argument more than thirty years ago, explaining that "Mirandanot only lacks an explicit requirement that an individual be informed of the charges about which he is to be questioned prior to waiving his rights but also lacks any implicit requirement that such action be taken by authorities before a valid waiver of rights can be executed by one who is to be interrogated." State v. Carter,296 N.C. 344, 352, 250 S.E.2d 263, 268 (1979) ; see also State v. Schneider,306 N.C. 351, 355, 293 S.E.2d 157, 160 (1982) ("Failure to advise a defendant of the nature of the charge about which he was being questioned does not render his confession inadmissible."); People v. Pease,934 P.2d 1374, 1379 (Colo.1997) (holding that "[t]he information that a warrant had been issued had no bearing on [the defendant's] ability to make a voluntary, knowing, and intelligent decision to waive his rights"); State v. Medlock,935 P.2d 693, 698 (Wash.Ct.App.1997) (holding that although officers did not inform the defendant that charges already had been filed against him, Mirandawarnings "sufficiently informed the defendant of his right to counsel during questioning and the consequences of waiving that right").
Simply put, Mirandadoes not require that a criminal defendant be apprised of all knowledge relevant to the accusations against him before making a knowing and intelligent waiver. The purpose of Mirandawarnings is "to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." Miranda,384 U.S. at 469. In deciding whether a defendant's waiver of his Fifth Amendment privilege was knowingly and intelligently made, the key determination thus is whether the defendant understood that he had the right to remain silent and that anything he said could be used as evidence against him. See Spring,479 U.S. at 574. The Constitution does not "require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." Id.at 576-77 (internal quotation marks omitted).
Here, the trial court specifically found that police fully and accurately advised Defendant of his rights prior to asking him any questions. Defendant knew he had a right to refrain from answering questions at any time and to insist at any point to the presence of counsel. The trial court found that Defendant waived these rights voluntarily, with no coercion, no threat or suggestion of violence, and no promise or offer of reward or inducement. The trial court's findings of fact are supported by competent evidence in the record, and those findings support the conclusion that Defendant's waiver of his right to remain silent was knowing, intelligent, and voluntary. See id.Accordingly, the trial court did not err in denying his motion to suppress on constitutional grounds.
B. Alleged Statutory Violation
Defendant next argues that the trial court violated the statutory mandate set out in N.C. Gen.Stat. § 15A-974(a)(2) by failing to suppress the confession based on the State's violation of the North Carolina Criminal Procedure Act. Defendant contends that the investigating officer substantially failed to comply with sections 15A-401(a) and 15A-501 of the Act, which set out procedures for effecting arrests and require law enforcement to inform a defendant of any outstanding arrest warrant and the nature of the charges against him "as soon as possible." N.C. Gen.Stat. § 15A-401(a)(2) ; see also id.§ 15A-501(1). Section 15A-974 of the Act, in turn, provides that upon timely motion, a trial court must suppress any evidence "obtained as a result of a substantial violation" of the Criminal Procedure Act. Id.§ 15A-974(a)(2). We decline to address the merits of this argument because, as explained below, any error on this ground was harmless.
"[A] new trial does not necessarily follow a violation of a statutory mandate. Defendants must show not only that a statutory violation occurred, but also that they were prejudiced by this violation." State v. Love,177 N.C.App. 614, 623, 630 S.E.2d 234, 240-41 (2006) (citation omitted). An error is not prejudicial unless there is a reasonable possibility that had the error in question not been committed, a different result would have been reached at trial. See State v. Hernandez,188 N.C.App. 193, 204, 655 S.E.2d 426, 433 (2008). Where a defendant contests the admissibility of evidence at trial, alleged error is reversible if it appears that the jury would have reached a different verdict had it not considered the challenged evidence. State v. Mason,144 N.C.App. 20, 27-28, 550 S.E.2d 10, 16 (2001). If, however, "it does not appear that the erroneous admission of evidence played a pivotal role in determining the outcome of the trial, the error is harmless." Id.at 28, 550 S.E.2d at 16.
Defendant argues that he was prejudiced by admission of the confession because the victim's trial testimony "[a]t times ... seemed coached and unnatural," and she admitted being confused by some questions on cross-examination. Defendant also alleges that the victim testified inconsistently with her statements to police and medical professionals about whether the first instance of sexual contact involved oral sex or Defendant touching her breasts, whether Defendant entered her room through a window or the front door, and whether Defendant ever touched her rectum in addition to her vagina. Finally, Defendant suggests that the tense relationship between Defendant and the victim's mother, including the mother's history of taking out criminal charges against Defendant, casts doubt on the truthfulness of the victim's allegations.
We reject Defendant's arguments and hold that in view of the overwhelming evidence of guilt which was properly admitted, any error in admitting Defendant's confession was harmless. The victim at all times was consistent in her recollection of the critical facts underlying the charges: that she and Defendant exchanged letters in the summer of 2011, that Defendant touched her breasts, that she performed oral sex on Defendant two times, and that Defendant attempted penetrative sex with her one time. At trial, K.L. testified regarding each of these alleged incidents, and her testimony was substantially consistent with her prior statements to medical professionals and police.
Moreover, K.L.'s mother testified that when she confronted him, Defendant admitted that he had written the victim a note asking K.L. to have sex with him. At trial, K.L.'s mother identified the torn piece of notebook paper she found in the laundry, and she read the words "have protection" written in her daughter's handwriting and the word "asleep" in Defendant's handwriting. The note was admitted into evidence.
Defendant admitted during his own testimony that he and K.L. wrote notes that he hid from K.L.'s mother. He testified that K.L. asked him to have sex in the notes she wrote to him. But he insisted-implausibly, given the secretive nature of the notes-that he wrote back to the victim only "to prove to someone else as in the police or anybody that wanted to get involved in the situation or matter, that I was not raping or touching or having sexual relations with [K.L.]."
In light of the juvenile victim's detailed testimony concerning the sex acts in which she and Defendant engaged, the admission of the note found by K.L.'s mother, the testimony of K.L.'s mother (including her testimony that Defendant at first admitted the he engaged in sex acts with K.L.), and Defendant's own testimony explaining why he wrote the notes to K.L., we conclude that any error below was harmless. Defendant has failed to show that there is a reasonable possibility the jury would have reached a different result had his confession been excluded. Accordingly, we find no prejudicial error.
Conclusion
The trial court's denial of Defendant's motion to suppress did not violate his Fifth Amendment rights or deprive him of the right to a trial free from prejudicial error.
NO PREJUDICIAL ERROR.
Chief Judge McGEE and Judge HUNTER, JR., concur.
Report per Rule 30(e).
Opinion
Appeal by Defendant from judgment entered 28 February 2014 by Judge Richard Brown in Scotland County Superior Court. Heard in the Court of Appeals 20 April 2015.