STATE OF NORTH CAROLINA v. ARTHUR JUNIOR COOK, DEFENDANT

No. COA11-767

(Filed 17 January 2012)

## 1. Evidence—defendant's statement to officer—same or similar testimony repeated

The trial court did not err by allowing a federal special agent to testify about defendant's statement that defendant walked through office buildings and took things to sell for crack. Defense counsel did not object to similar testimony, himself repeated the challenged testimony during cross-examination, and invited the witness to confirm that defendant made such statements.

## 2. Evidence—defendant's statements—voluntariness—no pretrial motion to suppress—no challenge at trial

The trial court did not err by allowing a federal special agent to testify about incriminating statements made to him by defendant where defendant challenged the voluntariness and constitutionality of the statements on appeal, but did not move to suppress the evidence pretrial, as required by statute, and did not challenge the voluntariness of the statements at trial.

## 3. Evidence—surveillance video—sufficiently substantiated

The trial court did not abuse its discretion by admitting surveillance video of a federal office from which items were stolen where defendant did not challenge the chain of custody, the facilities manager of the office testified that the video was a live streaming recording on a server, that he viewed the video as a technician made a copy immediately following the incident, and that the footage presented in court was the same. Assuming error in admitting the video footage, there was substantial evidence of defendant's guilt and no prejudice.

**4. Evidence—surveillance video—frozen frames—zoomed images**

The trial court did not err by allowing the jury to view during deliberations still images made by freezing surveillance video where the video had been admitted over defendant's objections. Allowing the jury to view zoomed portions of the photographs in the courtroom was also not error.

**5. Sentencing—prior record points—convictions not identified**

Defendant's sentencing was remanded where the Court of Appeals did not identify the convictions to which it assigned prior record points, so that it could not be determined whether the State proved by a preponderance of the evidence that such convictions (in-state or out-of-state) existed and that defendant was the convicted perpetrator.

Appeal by defendant from judgments entered 27 January 2011 by Judge W. Robert Bell in Mecklenburg County Superior Court. Heard in the Court of Appeals 28 November 2011.

*Roy Cooper, Attorney General, by David P. Brenskelle, Special Deputy Attorney General, for the State.*

*Anne Bleyman, for defendant–appellant.*

MARTIN, Chief Judge.

Defendant Arthur Junior Cook appeals from judgments entered upon jury verdicts finding him guilty of the offenses of felonious breaking or entering, larceny after breaking or entering, and attaining habitual felon status. We remand for resentencing.

The evidence presented at trial tended to show that, shortly after 8:00 a.m. on 16 September 2009, two employees of the U.S. Treasury's Office of the Comptroller of the Currency in Charlotte, North Carolina, reported to the office's facilities manager, James Robert McDonald, that several items had been taken from their offices sometime after 6:00 p.m. the previous evening. The items missing included a gym bag with a pair of Mizuno running shoes, an OGO tan and black backpack with assorted athletic apparel, four pairs of tickets to four New York Giants football games and parking passes to each of the games, as well as a government-issued laptop computer and its power cord. The offices from which the items were missing were secured by an electronic card reader and accessible by electronically-keyed

identification badges issued only to those who were authorized to enter the restricted area.

Because the reported thefts occurred in a federal government office, which occupied the entire fifth floor of the Charlotte office building, both the Federal Bureau of Investigation and the Charlotte–Mecklenburg Police Department investigated. Mr. McDonald accompanied investigators to identify those areas that seemed to have items out of place. Mr. McDonald informed investigators that the television monitor in a small conference room was "moved away from it's [sic] normal place" and "looked like somebody was trying to disconnect it." Mr. McDonald also identified a blue t-shirt located near the "out of kilter" monitor in the conference room, which "obviously didn't seem to belong to anybody [in the office]."

Mr. McDonald also informed investigators that the offices were monitored by twenty-four-hour surveillance cameras, which were maintained and operated by a third-party vendor. Mr. McDonald arranged for a technician to come to the office to make a copy of the surveillance video footage for the investigators. As the technician copied the surveillance video footage, Mr. McDonald reviewed the footage and saw a person enter the restricted area carrying "a little T shirt in his hand." Although the person in the surveillance video footage did not enter the restricted area carrying a bag, Mr. McDonald observed that, upon exiting the area, the person carried a backpack on his shoulder and a white object in his hand. Mr. McDonald provided the copy of the surveillance video footage to the police.

Two days after the theft, while providing off-duty security at Central Piedmont Community College, Sergeant David Scheppegrell of the Charlotte–Mecklenburg Police Department responded to a call reporting a "suspicious person" in a restricted area of the school's library. After witnesses advised Sergeant Scheppegrell that the suspicious person was exiting the library, the officer made contact with the subject and asked him why he was in the restricted area. At trial, Sergeant Scheppegrell identified defendant as the person with whom he made contact that day. Defendant appeared to Sergeant Scheppegrell to be "very, very nervous" and his responses seemed to be "evasive." Defendant was placed in handcuffs and detained while security officers investigated the matter further. After defendant consented to a search, Sergeant Scheppegrell found a Bank of America identification card with a woman's name and photograph on it, as well as several New York Giants football tickets and parking passes, which

the sergeant later determined had been reported stolen from the Office of the Comptroller of the Currency, on defendant's person.

While defendant was in custody, the police obtained two search warrants: one to search the bin containing the belongings stored for defendant while he was being held, and one to obtain a buccal swab from defendant. Upon searching the bin, the police collected a pair of Mizuno running shoes, an OGO tan and black backpack, and some athletic apparel. At trial, these items were identified as the items taken from one of the fifth-floor offices of the Office of the Comptroller of the Currency.

The next day, Special Agent Gerald R. Garren with the U.S. General Services Administration Office of the Inspector General traveled to Charlotte to investigate the reported burglary in the Office of the Comptroller of the Currency. After speaking with Mr. McDonald and reviewing the surveillance video footage, Special Agent Garren learned that the police had arrested someone for an unrelated crime who was in possession of the New York Giants football tickets that were reported stolen from the federal government office; he arranged to interview the suspect, whom the agent identified at trial as defendant.

During his interview with defendant, Special Agent Garren asked whether defendant had been involved in a theft occurring in an office building from which a laptop computer and football tickets were taken. Defendant "admitted that he had been involved in several burglaries," and told Special Agent Garren "that he had taken a laptop and that it was gone, the computer was gone. He also told [the agent] in the same setting [sic] that he had used it to purchase crack cocaine." Special Agent Garren further testified that defendant "told [him] that he enters buildings, he walks in through the front door, and he's able to go through office space and take things, laptops, phones, cameras, that he sells for crack," and that defendant admitted that, "in the course of four days[,] [defendant] had literally been inside of a hundred different offices."

At trial, Rachael Scott, a criminalist in the biology section of the crime laboratory with the Charlotte-Mecklenburg Police Department, testified that she was asked to obtain a DNA profile from the blue t-shirt collected from the scene and to compare that profile to a buccal swab sample obtained from defendant. Ms. Scott determined that the DNA profile obtained from the t shirt matched the DNA profile obtained from the buccal sample from defendant, and that the "probability of selecting an unrelated person at random for the

source of this DNA profile is approximately 1 in 470 trillion for Caucasians, one in 370 trillion for African[-]Americans, and 1 in 1.81 quadrillion for Hispanics."

Defendant did not present any evidence at trial and moved to dismiss the charges at the close of all the evidence. Defendant also moved for a mistrial on the grounds that both the surveillance video footage and the testimony from Special Agent Garren regarding defendant's "histories of burglary, and entering hundreds of buildings and stealing a laptop" were "very prejudicial." Both motions were denied.

The jury found defendant guilty of felonious breaking or entering, and larceny after breaking or entering. After hearing additional evidence, the jury found defendant guilty of being a habitual felon. The trial court determined that defendant had a total of twenty four prior record points and was a prior record level VI offender. Defendant was sentenced to two consecutive terms of 120 months to 153 months imprisonment. Defendant appeals.

I.

[1] Defendant first contends the trial court erred by allowing Special Agent Garren to testify that, during his interview with defendant, defendant made statements that "he had been involved in several burglaries," that "he had in the course of four days[,] he had literally been inside of a hundred different offices," and that "he enters buildings, he walks in through the front door, and he's able to go through office space and take things, laptops, phones, cameras, that he sells for crack." Defendant argues that such statements "effectually [sic] stripped [him] of the presumption of innocence" and could not have properly been considered by the jury as proof of motive for the charged offenses. We overrule this issue on appeal.

"Statements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot be prejudiced as a matter of law." *State v. Gobal*, 186 N.C. App. 308, 319, 651 S.E.2d 279, 287 (2007), *aff'd per curiam*, 362 N.C. 342, 661 S.E.2d 732 (2008). Accordingly, "a defendant who invites error has waived his right to all appellate review concerning the invited error, including plain error review." *State v. Barber*, 147 N.C. App. 69, 74, 554 S.E.2d 413, 416 (2001), *supersedeas denied and disc. reviews denied and dismissed as moot*, 355 N.C. 216, 560 S.E.2d 141–42 (2002). Additionally, "[w]here evidence is admitted without objection, the

benefit of a prior objection to the same or similar evidence is lost, and the defendant is deemed to have waived his right to assign as error the prior admission of the evidence." *State v. Wilson*, 313 N.C. 516, 532, 330 S.E.2d 450, 461 (1985).

Our review of the record reveals that, after the State elicited the challenged testimony from Special Agent Garren, on cross-examination, defense counsel repeated Special Agent Garren's testimony and invited Special Agent Garren to confirm that defendant made the challenged statements. For example, Special Agent Garren was invited to, and did, give affirmative responses to each of the following inquiries by defense counsel: "Even though [defendant] told you that he might have broke [sic] into so many buildings he told you he's not confessing to anything, correct?"; "[Defendant] said he doesn't break in doors, I open and walk in?"; and "[Defendant] told you that any items that he takes he sells for crack, correct?" Additionally, during direct examination, Special Agent Garren testified, without objection by defense counsel, that defendant "walked in through the front doors of office buildings, he didn't have to break and enter, that he took things to support his crack habit," and, when asked, "When you said [defendant] told you he's a thief[,] were those his words or are you just summarizing what he said?," Special Agent Garren responded, again without objection from the defense, "I'm summarizing what he said. He did state that he was a thief." Therefore, since defendant failed to object each time the same or similar now-challenged testimony was elicited from Special Agent Garren, and since defense counsel repeated the challenged testimony and invited Special Agent Garren to confirm that defendant made such statements to him, *see, e.g., State v. Carter*, ___ N.C. App. ___, ___, 707 S.E.2d 700, 708 ("Even assuming *arguendo* that [the forensic interviewer's] statement that 'something happened' was erroneously admitted, immediately following her statement, defense counsel repeated her testimony, thereby inviting [the interviewer] to again give her opinion that she thought 'something must have happened.' "), *disc. review denied*, 365 N.C. 202, 710 S.E.2d 9 (2011), we decline to address this issue on appeal further.

## II.

**[2]** Defendant next contends the trial court erred by allowing Special Agent Garren to testify about the incriminating statements that defendant made to him during his interview because defendant argues that any incriminating statements he made were given involuntarily during

a custodial interrogation, and that the admission of such statements through Special Agent Garren's testimony "was error of a constitutional magnitude," entitling defendant to a new trial. However, defendant did not move to suppress this evidence pre trial, in accordance with the procedures set forth in N.C.G.S. §§ 15A 975 through 15A 977, and defendant does not argue that his failure to file a timely motion to suppress this evidence was excused under any of the exceptions to the general rule that motions to suppress must be made pre-trial. *See State v. Satterfield*, 300 N.C. 621, 625, 268 S.E.2d 510, 514 (1980) ("A defendant may move to suppress evidence at trial only if he demonstrates that he did not have a reasonable opportunity to make the motion before trial; or that the State did not give him sufficient advance notice (twenty working days) of its intention to use certain types of evidence; or that additional facts have been discovered after a pretrial determination and denial of the motion which could not have been discovered with reasonable diligence before determination of the motion."). Moreover, we find no instance where, during the course of the trial, defendant challenged the voluntariness of the statements he made to Special Agent Garren. *See State v. Eason*, 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991) ("In order to preserve a question for appellate review, a party must have presented the trial court with a timely request, objection or motion, stating the specific grounds for the ruling sought if the specific grounds are not apparent."). Accordingly, we decline defendant's invitation to exercise our discretion to consider this issue for the first time on appeal. *See id.* ("This Court will not consider arguments based upon matters not presented to or adjudicated by the trial tribunal.").

### III.

**[3]** Defendant next contends the trial court abused its discretion by admitting the surveillance video footage collected from the scene, because he argues that the footage was not sufficiently authenticated by the State's witnesses.

Pursuant to N.C.G.S. § 8 97, "[v]ideotapes are admissible into evidence for both substantive and illustrative purposes," *State v. Cannon*, 92 N.C. App. 246, 254, 374 S.E.2d 604, 608 (1988), *rev'd in part on other grounds*, 326 N.C. 37, 387 S.E.2d 450 (1990), and "may be admitted into evidence where they are relevant and have been properly authenticated." *State v. Billings*, 104 N.C. App. 362, 371, 409 S.E.2d 707, 712 (1991) (citing *State v. Strickland*, 276 N.C. 253, 258, 173 S.E.2d 129, 132 (1970)), *appeal dismissed*, 332 N.C. 347, 421

S.E.2d 155 (1992). "The prerequisite that the offeror lay a proper found-ation for the videotape can be met by" any of the following: "(1) tes-timony that the motion picture or videotape fairly and accurately illustrates the events filmed"; "(2) proper testimony concerning the checking and operation of the video camera and the chain of evi-dence concerning the videotape"; "(3) testimony that the photographs introduced at trial were the same as those [the witness] had inspected immediately after processing"; or "(4) testimony that the videotape had not been edited, and that the picture fairly and accurately recorded the actual appearance of the area photographed." *Cannon*, 92 N.C. App. at 254, 374 S.E.2d at 608–09 (alteration in original) (inter-nal quotation marks omitted). Thus, there are "three significant areas of inquiry" for a court "reviewing the foundation for admissibility of a videotape: (1) whether the camera and taping system in question were properly maintained and were properly operating when the tape was made, (2) whether the videotape accurately presents the events depicted, and (3) whether there is an unbroken chain of custody." *State v. Mason*, 144 N.C. App. 20, 26, 550 S.E.2d 10, 15 (2001).

Here, defendant does not challenge the chain of custody of the copy of the surveillance video footage. Instead, defendant suggests that the authentication of the surveillance video footage was defi-cient in a manner similar to the deficiencies identified by this Court in *State v. Mason*, 144 N.C. App. 20, 550 S.E.2d 10 (2001). In *Mason*, although the store's employee and general manager testified at trial that the surveillance system "was in working order" at the time that their store was robbed, "neither one knew anything about the main-tenance or operation of the camera system"; one testified that she "could not even operate her home VCR," and the other "admitted that he did not know 'how the doggone thing works,' " and none of the State's witnesses testified that there was "any routine maintenance or testing of the . . . security system." *Mason*, 144 N.C. App. at 26, 550 S.E.2d at 15. In the present case, defendant directs us to Mr. McDonald's similar response to a question about how one of the sur-veillance cameras "work[s]," where Mr. McDonald answered, "Exactly—I mean it's on all the time. I don't know anything about how this works." However, defendant neglects to mention Mr. McDonald's response immediately following this statement to an almost identical question about how the camera "operate[s]," where Mr. McDonald answered: "It's a live streaming recording device that sends the imag-ine [sic] back to a server that records." Moreover, Mr. McDonald tes-tified that he viewed the surveillance video as the technician made a

copy of the footage immediately following the incident, and further testified that the footage presented in court was the same as that which he viewed when the copy was being made from the surveillance system's server a few days after the theft. *See, e.g., State v. Mewborn,* 131 N.C. App. 495, 499, 507 S.E.2d 906, 909 (1998) ("At trial, during *voir dire* . . ., Lieutenant Boyd stated that the images on the tape had not been altered and were in the same condition as when she had first viewed them on the day of the robbery. Because Lieutenant Boyd viewed the tape on both the day of the robbery and at trial and testified that it was in the same condition and had not been edited, there is little or no doubt as to the videotape's authenticity."). Taken together, we are not persuaded that the trial court abused its discretion by admitting the surveillance video footage in the present case.

Nevertheless, even assuming *arguendo* that the surveillance video footage was not sufficiently authenticated by the State's evidence, we are not persuaded that any error in its admission was prejudicial. *See Mason,* 144 N.C. App. at 27, 550 S.E.2d at 16. Here, a couple of days after the thefts from the Office of the Comptroller of the Currency, defendant was arrested and found to be in possession of the victim's missing Mizuno running shoes, the OGO tan and black backpack with some of the missing athletic apparel, and the four pairs of tickets to four New York Giants football games and parking passes which were reported as stolen. Further, defendant's DNA profile was matched to the blue t shirt found next to the jostled conference room monitor, and Special Agent Garren testified, without objection, that defendant told him that "[defendant] would have taken the monitor if he had had something to carry it out with." Since this evidence, taken together with defendant's other admissions to Special Agent Garren and the other evidence in the record, as well as defendant's failure to direct us to "[any]thing suggesting that the videotape in this case is inaccurate or otherwise flawed," *see State v. Jones,* 176 N.C. App. 678, 684, 627 S.E.2d 265, 269 (2006), was sufficient to establish that there was "substantial evidence of . . . defendant's guilt," *see Mason,* 144 N.C. App. at 28, 550 S.E.2d at 16, we hold that the admission of the surveillance video footage, even if erroneous, does not entitle defendant to any relief.

## IV.

[4] Defendant next contends the trial court erred by allowing the jury to view still images during its deliberations, which were made by

freezing the surveillance video footage at specified intervals. Defendant does not argue that the still images were erroneously admitted based on an insufficient authentication of the surveillance video footage from which the still images were made; instead, he asserts only that the trial court acted in violation of N.C.G.S. § 15A 1233, which provides that the trial judge "may permit the jury to reexamine in open court the requested materials admitted into evidence." N.C. Gen. Stat. § 15A 1233 (2011). Specifically, defendant asserts that the trial court erred because it allowed the jury to review "evidence that had not been admitted into evidence." However, the still images made available to the jury during its deliberations *were* admitted, albeit over defendant's objections, as State's Exhibits 13 through 18. Therefore, there was no violation of N.C.G.S. § 15A 1233 in allowing the jury to review the still images, which had been admitted into evidence. Additionally, defendant suggests, without authority, that the court acted in contravention of this statute because it allowed the jury to "view zoomed in portions of the[se] photographs" while reviewing the images in the courtroom. Because defendant failed to provide any legal authority in support of his assertion that the court abused its discretion or acted beyond the scope of its statutory authority by allowing the jury to get a closer view of the admitted evidence, we overrule the remainder of this issue on appeal.

V.

[5] Finally, defendant contends the trial court erred by sentencing him as a prior record level VI offender, because defendant asserts that the court incorrectly determined that he had twenty four prior record points. Defendant argues that sixteen of the twenty four prior record points assigned by the court were derived from out of state convictions, and asserts that the State failed to prove by a preponderance of the evidence whether such convictions were felonies or misdemeanors.

"For each prior [North Carolina] felony Class H or I conviction, [an offender will be assigned] 2 points"; "[f]or each prior [Class A1 and Class 1 nontraffic North Carolina] misdemeanor conviction . . ., [an offender will be assigned] 1 point." N.C. Gen. Stat. § 15A 1340.14(b)(4)–(5) (2011). A conviction occurring in "a jurisdiction other than North Carolina is classified as a Class I felony if the jurisdiction in which the offense occurred classifies the offense as a felony, or is classified as a Class 3 misdemeanor if the jurisdiction in which the offense occurred classifies the offense as a misdemeanor." N.C. Gen. Stat.

§ 15A 1340.14(e). "The State bears the burden of proving, by a preponderance of the evidence, that a prior conviction exists and that the offender before the court is the same person as the offender named in the prior conviction." N.C. Gen. Stat. § 15A 1340.14(f). A prior conviction may be proved by "[s]tipulation of the parties," "[a]n original or copy of the court record of the prior conviction," or "[a] copy of records maintained by the Division of Criminal Information [("DCI")], the Division of Motor Vehicles, or of the Administrative Office of the Courts." N.C. Gen. Stat. § 15A 1340.14(f)(1)–(3).

The record shows that, in the present case, defense counsel declined to stipulate to defendant's prior convictions in open court and declined to sign the "Stipulation" section of the Prior Record Level Worksheet prepared by the State. Although the trial court found that, "[f]or sentencing purposes[,] . . . [defendant] has nine prior Class H or I felony convictions, and five prior class A 1 or 1 misdemeanor convictions for a total of twenty[ ]three points," the State only presented the trial court with certified copies of two DCI reports from Richland County, South Carolina, as evidence of defendant's February 2005 and September 2005 out of state felony convictions for burglary in the third degree and auto breaking, and with a certified copy of defendant's August 2007 Mecklenburg County, North Carolina, judgment and plea agreement for three counts of felony larceny. Thus, it is not clear to this Court from which of the thirty seven offenses listed in Section IV of defendant's Prior Record Level Worksheet the trial court assigned defendant's twenty three prior record level points. We further note that, based on the evidence presented with respect to the two South Carolina felony convictions, the court could only assign defendant four prior record points for these convictions. *Cf.* N.C. Gen. Stat. § 15A 1340.14(e) ("If the State proves by the preponderance of the evidence that an offense classified as either a misdemeanor or a felony in the other jurisdiction is substantially similar to an offense in North Carolina that is classified as a Class I felony or higher, the conviction is treated as that class of felony for assigning prior record level points."). Since the court did not identify from which convictions it assigned its twenty three prior record points, we cannot determine whether the State proved by a preponderance of the evidence that such convictions—either from out of state or from within this jurisdiction—existed and that defendant was the convicted perpetrator. *See* N.C. Gen. Stat. §§ 15A 1340.13, 15A 1340.14 (2011). Accordingly, we must remand this matter to the trial court to identify on which of the thirty seven prior felonies and

**KLINGSTUBBINS SE., INC. v. 301 HILLSBOROUGH ST. PARTNERS, LLC**

[218 N.C. App. 256 (2012)]

misdemeanors the court based its prior conviction point assignments to determine that defendant was a prior record level VI offender.

No error; Remanded for resentencing.

Judges ELMORE and STEPHENS concur.