STATE OF NORTH CAROLINA v. CINDY HAMMER STEVENSON BARBER

No. COA00-895

(Filed 6 November 2001)

**1. Appeal and Error— invited error—request to publish exhibit to jury—reference to polygraph**

A first-degree murder defendant waived her right to object to the failure to redact a reference to a polygraph from one of the exhibits where defendant requested that the exhibit be published to the jury even though the court warned that it was not properly redacted. If admission of this evidence was error, it was invited error.

**2. Constitutional Law— due process—State's failure to disclose exculpatory evidence—prejudicial**

The State violated a first-degree murders defendant's due process rights by failing to disclose cellular telephone records to defendant until after the trial where the trial court found that the records merely corroborated other evidence, but the records also lent crucial support to a witness whose credibility was questioned by the State. Given the court's finding at the motion for appropriate relief hearing that "very little additional evidence" could have changed the verdict and the jury's obvious difficulties in resolving the issues, it cannot be said that the State's failure to disclose exculpatory evidence did not create a reasonable probability of a different verdict.

Appeal by defendant from judgment entered 23 November 1999 by Judge Melzer A. Morgan, Jr., in Alexander County Superior Court. Heard in the Court of Appeals 13 August 2001.

*Attorney General Roy Cooper, by Assistant Attorney General T. Brooks Skinner, Jr., for the State.*

*Marjorie S. Canaday for defendant appellant.*

TIMMONS-GOODSON, Judge.

On 23 November 1999, a jury found Cindy Hammer Stevenson Barber ("defendant") guilty of first-degree murder in the death of her husband, Tony Charles Stevenson ("decedent"). Evidence at trial tended to show the following: On the evening of 31 January 1996, defendant telephoned 911 emergency assistance and informed the dispatcher that decedent had shot himself. Responding to the call, Alexander County Sheriff's Sergeant Arthur Duncan ("Sergeant Duncan") arrived at defendant's residence, where he discovered decedent lying in a recliner in the living room. Decedent was turned on his left side in the recliner, which was in a horizontal position. Decedent held a .380 semi-automatic pistol loosely in his left hand with the barrel pointing towards his head, which was covered in blood on the right side. As Sergeant Duncan approached him, decedent was gasping, looking at the gun, and jerking his hand. Sergeant Duncan immediately seized decedent's wrist and removed the weapon, which was loaded and in a cocked position. Sergeant Duncan observed cupcakes on the floor of the living room, and defendant explained that she had been frosting cupcakes for her daughter's birthday when decedent

shot himself. Upon further inspection of the residence, Sergeant Duncan discovered the seven-year-old son of defendant and decedent asleep in bed. No one else was in the home. While Sergeant Duncan secured the residence, defendant remained on the telephone with the emergency dispatcher. Defendant was visibly upset and "doing a lot of yelling and cussing." Emergency medical technicians soon arrived and removed decedent's body.

Dr. John M. Bauer ("Dr. Bauer"), the pathologist who performed decedent's autopsy, testified for the State. Dr. Bauer stated that he found a close contact gunshot wound to decedent's right temple, about an inch above and in front of the right ear. The track of the bullet was from right to left, straight and slightly downward at five degrees. According to Dr. Bauer, the wound was almost immediately fatal, and decedent would have had no motor control of his extremities or any bodily function after the bullet entered decedent's brain.

Linda Cox ("Cox"), a friend of decedent and defendant, testified that she hosted a party attended by defendant and decedent approximately six months before decedent's death. Cox stated that defendant and decedent arrived and departed from the party separately, and that decedent appeared to be "pretty upset" and "kind of mad." Cox also noted that defendant flirted with several men at the party, and that decedent consumed an excessive amount of alcohol.

Steve Fox ("Fox"), decedent's cousin, further testified on behalf of the State. Fox stated that he was also present at Cox's party, when defendant approached him and asked him whether he would kill decedent for her. According to Fox, who was "shocked" and declined defendant's request, defendant appeared to be "aggravated and mad" at the time. Fox did not know whether or not defendant was joking when she made her request. Fox later observed defendant leaving the party with Ricky Speaks, who testified that he and defendant engaged in sexual intercourse later that evening.

Several witnesses for the State testified as to decedent's actions and general state of mind on the days leading up to his death. Andrew Stevenson ("Stevenson"), decedent's brother, recalled a telephone conversation he had with decedent on 28 January 1996, in which decedent told Stevenson he was considering moving to Florida, where Stevenson resided. Stevenson testified that he offered "to let [decedent] move down, bring [defendant] down, bring [their children] and move in [Stevenson's] home and get a job and

start over from scratch, a whole new life." Decedent also spoke with Stevenson of his frustration with defendant and her drug addiction.

Amy Pennell ("Pennell"), a friend of defendant, testified that on the evening of decedent's death, she telephoned decedent at his residence several times and informed him that she planned to take out a warrant for his arrest for communicating threats against her. Pennell explained that she had been "drinking a lot" when she called decedent. Pennell could not remember her exact words to decedent, nor could she recall, beyond the fact that it was nighttime, the times at which she called. Pennell stated that she continued to call decedent, who responded by "hanging up on [her]."

The State presented further expert testimony by SBI Agent Peter Duane Deaver ("Agent Deaver"). Agent Deaver, an expert in blood stain pattern analysis and firearms, testified that, in order to restore a .380 semi-automatic pistol to a cocked position, one must maintain a strong grip on the weapon. Agent Deaver further stated that the type of blood spatter found on decedent's gun rarely occurs in cases of self-inflicted wounds. Finally, Agent Deaver testified that the blood-stains on decedent's recliner were inconsistent with the reported position of decedent's body in the chair.

Defendant presented evidence at trial tending to show the following: On 23 January 1996, decedent visited his physician, Dr. Alan Forshey ("Dr. Forshey"), in order to obtain a refill for Xanax, a prescribed medication decedent took in order to manage his substance abuse problems. Decedent had previously informed Dr. Forshey that "as long as [decedent] took the Xanax he could stay off of alcohol and . . . be pleasant and less angry." Dr. Forshey testified that decedent had an "addictive personality," with a history of depression, tendinitis and hypertension, and that during the consultation, decedent told Dr. Forshey "[defendant] had left him approximately in November . . . . [and decedent] had four children to raise and that he was working two different jobs." Decedent further informed Dr. Forshey he had not taken his medication for a month, and that he was drinking alcohol in the evenings.

Defendant presented testimony by William S. Best ("Best"), a firearms expert, who demonstrated several positions in which decedent could have shot himself in the right temple with his left hand without difficulty. Best also characterized defendant's theory that traces of blood may be found inside the barrel of a weapon due to the

partial vacuum created whenever a gun is fired as "a very reasonable explanation."

Defendant also presented evidence by several witnesses of decedent's actions and demeanor before his death. Edward Jennings ("Jennings"), decedent's attorney, testified that decedent and defendant consulted him at his office on 30 January 1996 regarding some traffic citations issued to decedent. According to Jennings, defendant was "very supportive" of decedent, who appeared "depressed and somewhat despondent" over the citations. Gary Harrington ("Harrington"), decedent's co-worker, testified that decedent was prone to "dramatic mood swings" and became "really depressed" when he consumed alcohol. On the day he died, decedent told Harrington that "he wasn't going back to jail for nobody [sic] and that he'd shoot his self [sic] if he had to." Finally, decedent's friend Michael Caldwell ("Caldwell"), testified that he spoke with decedent on the night of his death. Decedent was upset and threatening suicide, telling Caldwell, "I'm not going back to prison. I'll blow my brains out, but I'm not going back to prison." Caldwell also stated that decedent generally carried a gun. Defendant did not testify.

The jury began deliberations on Friday afternoon. On Monday afternoon, the jury informed the court that it was deadlocked on a vote of nine to three, with no movement. The following morning, the Tuesday before the Thanksgiving holiday, two jury members reported deaths of immediate family members. The jury refused the court's offer of a morning break from deliberations, however, informing the court that it could reach a verdict if granted five more minutes. Shortly thereafter, the jury returned its verdict, finding defendant guilty of first-degree murder in the death of her husband. Accordingly, the trial court sentenced defendant to life imprisonment without parole. Thereafter, defendant filed a motion for appropriate relief, which the trial court denied. Defendant now appeals her conviction and the denial of her motion for appropriate relief to this Court.

---

While presenting nine assignments of error for our review, the dispositive issues are whether the trial court committed reversible error in failing to redact a reference to defendant's polygraph examination contained in an exhibit tendered to the jury and denying defendant's motion for a mistrial.

[1] Defendant first argues the trial court erred in failing to redact a reference to a polygraph examination contained in one of the exhibits

tendered to the jury. At the beginning of defendant's trial, the court granted the State's motion *in limine* to prohibit any reference to a polygraph test administered to defendant by law enforcement officers, the results of which were favorable to defendant. In publishing the typed report of defendant's 2 April 1996 statement to the jury, however, the State failed to redact the following sentence: "Details of the polygraph examination conducted by SA J. L. Jones will be dictated to this file by SA J. L. Jones." Defendant now contends that this sentence may have given the jury the false and prejudicial impression that defendant had failed a polygraph examination.

We note that defendant did not object to admission of the evidence at trial, nor to its submission to the jury. In fact, defendant requested that the exhibit be published to the jury, although the trial court warned that "there was a part of the defendant's statement that was not properly redacted." The trial court further advised both parties to "[u]nderstand that once you've sent these exhibits out, if later on you discover that there was something in them that wasn't supposed to come in . . . you each have waived that."

North Carolina General Statutes section 15A-1443(c) states that "[a] defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct." N.C. Gen. Stat. § 15A-1443 (c) (1999). Thus, a defendant who invites error has waived his right to all appellate review concerning the invited error, including plain error review. *See State v. Roseboro*, 344 N.C. 364, 373, 474 S.E.2d 314, 318 (1996). In the instant case, defendant requested that the exhibit containing the polygraph evidence be submitted to the jury, despite explicit warnings by the trial court that defendant's statement had not been properly redacted. Thus, if the admission of such evidence to the jury was error, it was invited error, and defendant has therefore waived her right to appellate review of this issue. We overrule defendant's first assignment of error.

[2] Defendant next argues the trial court erred by denying defendant's motion for a mistrial based on evidence of cellular phone records first disclosed to defendant by the State after her trial. Citing *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963), defendant contends the State's failure to reveal the phone records violated defendant's due process rights and asserts that, had the phone records been introduced at trial, there is a reasonable probability that the result of the trial would have been different. *See State v. Campbell*, 133 N.C. App. 531, 541, 515 S.E.2d 732, 739, *disc. review denied*, 351 N.C. 111, 540 S.E.2d 370 (1999). At the hearing on de-

fendant's motion for appropriate relief, the trial court found that, although the phone records were exculpatory and unavailable to defendant, they were ultimately immaterial because they merely corroborated other evidence. The trial court therefore denied defendant's motion. We conclude that the State's failure to disclose the phone records was error which prejudiced defendant, thereby entitling her to a new trial.

The cellular phone records at issue reveal that, on the night of decedent's death, Amy Pennell repeatedly telephoned decedent's residence, making two calls at 9:54 p.m. and 9:55 p.m., and six more calls between 1:49 a.m. and 2:41 a.m following decedent's death. Defendant argues these phone records were exculpatory, in that they bolstered Pennell's testimony that she threatened decedent with arrest shortly before his death. Such evidence in turn supported defendant's assertions at trial that decedent killed himself because he was despondent and agitated at the thought of returning to prison. The State concedes it should have disclosed the cellular phone records to defendant, but nevertheless argues that the records merely corroborated other testimony and therefore did not prejudice defendant. We cannot agree.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218. Prejudicial error is determined by examining the materiality of the evidence. *See State v. Howard*, 334 N.C. 602, 605, 433 S.E.2d 742, 744 (1993). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceeding would have been different. *See id.* at 605-06, 433 S.E.2d at 744. Reasonable probability is "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494 (1985).

At trial, Pennell could only recall that "it was dark" and "nighttime" when she telephoned decedent on the evening of his death. On cross-examination, Pennell agreed that she began telephoning decedent between 9:00 p.m. and 12:00 a.m., but could remember no further details of the calls. Defendant telephoned for emergency assistance at approximately 11:00 p.m. Although the State never directly contradicted Pennell's assertion that she spoke with decedent the night of his death, the State did cast general aspersions upon Pennell's credibility. Referring to Pennell in its closing argument, the State advised

the jury to "consider who these folks are and what they're telling you," adding that, "[i]t's your jobs to determine who's telling you the truth." Furthermore, Chief Deputy Bentley testified that he did not know whether or not his office had ever received the cellular phone records, but that he could "not recall" having ever seen them. Thus, because the phone records show the exact times and duration of Pennell's calls, they were not merely corroborative, but lend crucial factual support to somewhat nebulous testimony by a witness whose credibility was questioned by the State.

At defendant's motion for appropriate relief hearing, the trial court found that "this case could have also resulted in a jury verdict of not guilty. It would have taken very little additional evidence to result in the jury returning a verdict of not guilty." Moreover, in her offer of proof, defendant submitted affidavits from two jurors confirming that, had the phone records been introduced at trial, it "would have" and "could have" affected the verdict. Given the court's finding that "very little additional evidence" could have changed the verdict and the jury's obvious difficulties in resolving the issues, we cannot say that the State's failure to disclose exculpatory evidence did not create a reasonable probability of a different verdict. Accordingly, the evidence was material to defendant.

The State's failure to turn over evidence to defendant that was both favorable and material does not guarantee defendant a new trial, unless the failure was prejudicial to defendant. *See State v. Alston*, 307 N.C. 321, 339, 298 S.E.2d 631, 644 (1983). A violation of defendant's constitutional rights is prejudicial unless this Court "finds that it was harmless beyond a reasonable doubt." N.C. Gen. Stat. § 15A-1443(b) (1999).

We have determined that cellular phone records held by the State were both favorable and material to defendant, thereby violating defendant's constitutional right to have the evidence. *See State v. McGill*, 141 N.C. App. 98, 103-04, 539 S.E.2d 351, 356 (2000). The State has the burden of showing the error was harmless beyond a reasonable doubt. *See* N.C. Gen. Stat. § 15A-1443(b). The State has failed to meet such burden, and defendant is therefore entitled to a new trial.

We have carefully considered defendant's remaining assignments of error and find them to be without merit. Because of the State's failure to disclose exculpatory evidence to defendant, we hold defendant is entitled to a new trial.

New trial.

Chief Judge EAGLES and Judge THOMAS concur.