An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-1037

Filed 7 January 2026

Buncombe County, No. 21CR087888-100

STATE OF NORTH CAROLINA

v.

DAVID RAYMOND RICHARDS, Defendant.

Appeal by Defendant from judgment entered 1 November 2023 by Judge Alan Z. Thornburg in Buncombe County Superior Court. Heard in the Court of Appeals 27 August 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Kristin Cook McCrary, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Brandon B. Mayes, for Defendant-Appellant.*

CARPENTER, Judge.

David Raymond Richards ("Defendant") appeals from judgment entered after a jury found him guilty of one count of taking indecent liberties with a child. Defendant argues the trial court erred by: (1) allowing a witness to improperly vouch

for the child's version of events; and (2) failing to declare a mistrial sua sponte. After careful review, we discern no error.

## I. Factual & Procedural Background

On 3 April 2023, a Buncombe County grand jury indicted Defendant for one count of taking indecent liberties with a minor based on an incident with his minor daughter, J.R.[1], that occurred on 1 March 2021. Defendant's case proceeded to trial on 23 October 2023, and the evidence tended to show the following.

Defendant has two daughters, including J.R., with his ex-wife. J.R. was thirteen on 1 March 2021 and her sister was approximately seventeen. Defendant and his ex-wife divorced prior to 1 March 2021, and J.R. lived "almost full-time" with her mother "other than [living] three days every other week" with Defendant. J.R. was staying with Defendant on 1 March 2021.

J.R. testified that on 1 March 2021, she "went to school like normal" and returned to Defendant's house "around 4 o'clock." That evening, J.R. and Defendant "had an argument about dinner" that "lasted like hours." J.R. testified that the argument "ended by [J.R.] going into [her] room to have a little bit of space." Later that evening, Defendant entered J.R.'s room "talking about lotions for eczema." According to J.R., she struggled with "bumpy" and dry skin on her arms as a younger

---

[1] Initials used to protect the identity of the minor child and for ease of reading. *See* N.C. R. App. P. 42(b).

child but was not experiencing skin difficulties on 1 March 2021. J.R. testified that it seemed "kind of random" when Defendant entered her room talking about eczema lotion. At the time, J.R. was wearing jeans and a long-sleeved shirt, with a tank top and sports bra underneath. According to J.R., Defendant "was suggesting that [she] should try the lotion . . . ." J.R. then removed her long-sleeved shirt, leaving on her tank top and jeans, and followed Defendant to the hallway next to his bedroom where he had the lotion "uncapped and ready." There, Defendant began to apply the lotion.

After Defendant began applying the lotion to her arms, according to J.R., Defendant lifted her tank top. In response, J.R. "kind of put [her] arms closer to [her] sides to kind of hold" her tank top down. J.R. said she "was very scared" and "a little bit confused" at this time. After J.R. positioned her arms to prevent Defendant from lifting her tank top, Defendant "kind of left the [tank] top there where it already was and then went back for more lotion and kept applying it to [her] arms." Shortly thereafter, according to J.R., Defendant removed her tank top, leaving her wearing only a sports bra. J.R. testified that after he removed her tank top, Defendant "slipped his hands into the cup of the right side of [her] bra" and held her right breast. J.R. explained that Defendant's hands did not have lotion on them when he touched J.R.'s breast. After a "short" time, J.R. "stepped back a little bit to give [them] some space" and Defendant resumed applying lotion on J.R.'s arms. But again, Defendant "slipped both of his hands into [J.R.'s] bra." After Defendant did so, J.R. was "just completely frozen." Then, according to J.R., Defendant "started to slip one of his

hands into [J.R.'s] pants." At this moment, J.R. observed that Defendant was "smirking" and that his eyes went "dark" because "his pupils had kind of enlarged." J.R. testified that when Defendant's hand reached her panty line, she "pushed him away." J.R. grabbed her tank top, returned to her room, and locked the door because she "was afraid of [Defendant] coming back."

J.R. testified that she felt "small" after Defendant touched her, and that she contemplated leaving his home that night but "decided to stay quiet and wait until [she] had therapy the next day." J.R. regularly attended therapy on Tuesdays at 4 p.m. after school. The next day, J.R. attended school and did not tell anyone about Defendant touching her. According to J.R., she did not tell anyone because she "didn't really know what to say" and "didn't want to run the risk of seeming like [she] was lying." After school, J.R. attended therapy and informed her therapist, Tara Noid, that Defendant touched her the previous evening.

Noid testified that J.R. came to her therapy session on 2 March 2021 "visibly upset." Noid further said that J.R. "was crying" and "shaking" when she recounted the previous evening with Defendant. According to Noid, J.R. told her that Defendant took off her tank top, said "your titties have gotten big[,]" put lotion on her arms and stomach, and put his hand down the front of her pants. Noid testified that J.R. "was close to hysterically sobbing" as she was "unable to speak at different points while telling the story." After 2 March 2021, J.R.'s weekly therapy sessions with Noid included cognitive behavioral therapy to address "the trauma that [J.R.] had

experienced." According to Noid, J.R. "was very emotional in the weeks after that event, spoke frequently about what happened at [Defendant's] house, how she felt about it."

Investigator Brittany Anderson, with Buncombe County Child and Family Services ("CPS"), received a report on 2 March 2021 regarding J.R.'s allegations against Defendant. Anderson interviewed J.R. and Defendant. Defendant told Anderson that after school on 1 March 2021, J.R. became "really emotional" and stayed in her room until around 8:30 p.m. When J.R. "came out of her room, she made macaroni-and-cheese, and then [Defendant] put on lotion, and then they went to bed." According to Anderson, Defendant said that when he applied the eczema lotion, "he started doing her arms" and "he took off her tank top, so she was just wearing the bra, to kind of do her back and shoulders." Defendant told Anderson that "he unclasped [J.R.'s] bra, but didn't take it off, to kind of get underneath . . . on her back." Anderson testified Defendant "denied that he made any comments about [J.R.'s] breasts" and "denied that he put his hands in her pants."

According to Anderson, Defendant initially stated that "he didn't know" why J.R. "said he did this." Defendant also speculated that "maybe . . . [J.R.] was angry at him." Defendant then informed Anderson that he could not have "done this, because he hasn't been sexually active in nine years." Moreover, Defendant told Anderson that J.R. and her sister lied in the past "so maybe that's . . . what they're doing now." Anderson testified to her investigation process and said that she made

a maltreatment finding in Defendant's case. Anderson also said DSS substantiated J.R.'s sexual abuse allegations against Defendant and that Anderson "provided [Defendant] with . . . paperwork" indicating he was put on "the responsible-individuals list."

Defendant testified that J.R. and her sister "fabricated stories" in the past to "get what they wanted" regarding their custody arrangement between Defendant and their mother. For example, according to Defendant, J.R. and her sister "stretched" the truth about their mother to "spend more time with" Defendant because he "was a fun dad" and "they were doing all kinds of fun activities and it was a fun, fun house." Defendant also testified about the incident that occurred on 1 March 2021. According to Defendant, J.R. became "explosive" after he picked her up from school that day and she "scream[ed] and cuss[ed] . . . [a]nd this went on for a long time." Defendant said J.R. eventually went to her bedroom until approximately 8:00 p.m. when "she finally came out of her room and sat down on the couch . . . ."

Defendant testified that he and J.R. engaged in "small talk" on the couch. Defendant eventually asked "what the problem was with [J.R.'s] arms," to which J.R. replied that she has "some really bad skin" and "she's tried lotions" but "nothing's worked." According to Defendant, he said "I have something that may be able to help you" and J.R. "said okay." Defendant explained that J.R. remained seated on the couch while he retrieved "ointment" and J.R. "took off her sweatshirt, she took off a

flannel shirt, she took off a long-sleeved T-shirt, and sat there with her jeans and . . . tank top on with a bra underneath."

Defendant testified that he applied the ointment to J.R.'s upper arms and "on the back of her shoulders." According to Defendant, he had "to get the tube and put a little bit more on . . . several times . . . ." Defendant said: "I never saw her bra. I never touched her anywhere else. I never said anything sexual to her. I never made comments about her. I was trying to give help to my daughter." Finally, according to Defendant, he gave J.R. "kind of a weird hug because [he] didn't want to get the ointment on [him] from her arms and shoulders . . . and [J.R] went to her bedroom."

The State did not present physical evidence at trial. During jury deliberations, the jury sent the trial court a note stating: "After careful deliberation and reviewing all notes and evidence available to us, the jury has reached an impasse and feel that we will be unable to reach a unanimous verdict." The trial court told the jury "I'm going to allow you to go to lunch, and hopefully a good lunch . . . might help you proceed to a verdict." The jury ultimately found Defendant guilty as charged. The trial court sentenced Defendant to a minimum of sixteen months and maximum of twenty-nine months imprisonment, suspended for a period of twenty-four months of supervised probation. The trial court also ordered Defendant to permanently have no contact with J.R, and register as a sex offender. On 6 November 2023, Defendant filed written notice of appeal.

## II. Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. §§ 7A-27(b)(1) and 15A-1444(a) (2023).

### III. Issues

The issues are whether the trial court erred by: (1) allowing Anderson to improperly vouch for J.R.'s version of events; and (2) failing to declare a mistrial sua sponte.

### IV. Analysis

Defendant argues the trial court erred by allowing Anderson to improperly vouch for J.R.'s version of events. In particular, Defendant contends the trial court erred by allowing Anderson to testify that: (1) DSS made a maltreatment finding; (2) Defendant was placed on the responsible-individuals list; (3) DSS corroborated J.R.'s allegations against Defendant; and (4) Defendant's admissions matched J.R.'s allegations against Defendant. As a result, Defendant also argues the trial court erred by failing to declare a mistrial sua sponte based on Anderson's testimony. We disagree.

#### A. Improper Vouching

First, Defendant argues the trial court erred by allowing Anderson to testify that DSS made a maltreatment finding and Defendant was placed on the responsible-individuals list. During trial, the State asked Anderson: "Okay. Ultimately, did you come to a maltreatment finding in this case?" Anderson replied, "Yes." Then the

State asked Anderson, "Following a maltreatment finding, what steps do you take?"

Anderson responded:

> So, it depends on the maltreatment finding. If we find physical abuse or sexual abuse, perpetrators are then put on what's called a "responsible-individuals list." And the purpose of this list is so day-care schools can pull this list if they want when looking up people to employ. But because this list does affect things, they have due process –
> . . .
> – so we serve them with a notification saying, "You're being put on the responsible-individuals list. Here are the steps to take if you would like to contest this." And so I – I provided him with that paperwork.

Defendant concedes he did not timely object to these challenged statements from Anderson. *See* N.C. R. App. P. 10(a)(1) ("In order to preserve an issue for appellate review, a party must have presented the trial court with a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds are not apparent from the context."). Nonetheless, we may "review unpreserved issues for plain error when they involve either (1) errors in the judge's instructions to the jury, or (2) rulings on the admissibility of evidence." *State v. Gregory*, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996). To establish plain error, a defendant must pass a three-part test:

> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a probable impact on the outcome, meaning that absent the error, the jury probably would have returned a different verdict. Finally, the defendant must show that the error is an exceptional case that warrants plain error review, typically by showing that the error seriously affects

the fairness, integrity or public reputation of judicial proceedings.

*State v. Reber*, 386 N.C. 153, 158, 900 S.E.2d 781, 786 (2024) (cleaned up). As Defendant "specifically and distinctly" argues the trial court plainly erred by allowing the challenged portions of Anderson's testimony, we will review for plain error. *See State v. Frye*, 341 N.C. 470, 496, 461 S.E.2d 664, 677 (1995); N.C. R. App. P. 10(a)(4).

"In a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has *in fact* occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility." *State v. Stancil*, 355 N.C. 266, 266–67, 559 S.E.2d 788, 789 (2002) (emphasis in original). The same rule extends to a "witness who is a DSS worker or child abuse investigator because, even if she is 'not qualified as an expert witness, . . . the jury [will] most likely [give] her opinion more weight than a lay opinion.'" *State v. Crabtree*, 249 N.C. App. 395, 401, 790 S.E.2d 709, 714–15 (2016), *aff'd*, 370 N.C. 156, 804 S.E.2d 183 (2017) (alteration in original) (quoting *State v. Giddens*, 199 N.C. App. 115, 122, 681 S.E.2d 504, 508 (2009), *aff'd per curiam*, 363 N.C. 826, 689 S.E.2d 858 (2010)).

In *State v. Warden*, a DSS investigator testified that DSS "substantiated sexual abuse naming [the defendant] as the perpetrator." 268 N.C. App. 646, 648, 836 S.E.2d 880, 883 (2019). The DSS investigator also explained:

> [P]art of our role is to determine whether or not we believe allegations to be true or not true. If we believe those

allegations to be true, we will substantiate a case. If we believe them to be not true or we don't have enough evidence to suggest that they are true, we would un-substantiate a case.

*Id.* at 648, 836 S.E.2d at 882 (alteration in original). This Court concluded the "trial court erred by allowing [the DSS investigator] to vouch for the credibility of [the minor child's] allegations against [the defendant] by testifying to the *conclusion* reached by DSS based upon those allegations." *Id.* at 651, 836 S.E.2d at 884 (emphasis added). Because there was no physical evidence supporting the minor child's allegations, and the State's case rested on the credibility of the minor child, we determined that the admission of the DSS investigator's testimony amounted to plain error. *Id.* at 651–52, 836 S.E.2d at 884–85.

Here, the trial court allowed Anderson to testify that DSS made a maltreatment finding during its investigation into J.R.'s allegations of sexual abuse against Defendant. The trial court also allowed Anderson to indicate that Defendant was placed on the responsible-individuals list. While these statements by Anderson are all factually correct concerning procedural steps taken by DSS, Anderson's testimony does not amount to a direct conclusion that Defendant in fact committed sexual abuse. *See id.* at 651–52, 836 S.E.2d at 884–85. Moreover, Anderson testified that when DSS makes maltreatment findings for physical abuse and sexual abuse, all perpetrators are put on the responsible-individuals list. In addition, Anderson's testimony indicates that individuals may contest their placement on the responsible-

individuals list, demonstrating that placement on the list may not be conclusive of

abuse. Accordingly, the trial court did not err by allowing Anderson to testify that

DSS made a maltreatment finding and Defendant was on the responsible-individuals

list. Because the trial court did not err, it did not plainly err. *See Reber*, 386 N.C. at

158, 900 S.E.2d at 786.

Defendant also argues the trial court plainly erred by allowing Anderson to

testify that DSS corroborated J.R.'s allegations and Defendant's admissions matched

J.R.'s allegations. During Anderson's cross-examination, she testified as follows:

> **Defense counsel:** . . . So everybody's just acting off of some statements that the alleged victim made. Right? That's pretty much where we are – right? -- or the reporter made. Right?
> **Anderson:** So we look at the totality of investigations. So we look for what we call "corroborating information." So, for instance, [J.R.'s] statement about what the cream looked like and where it would be completely matched when I found it. And so those are also things that contribute to findings.
> **Defense counsel:** That – that matched.
> **Anderson:** Yes.
> . . .
> **Defense counsel:** . . . And . . . that's about it. Right? That's pretty much the corroborating evidence. She said, "This is what the cream looks like."
> **Anderson:** So, additionally, she was interviewed by myself. She was interviewed by the forensic interviewer at the CAC. And she also disclosed to her therapist. And she was consistent throughout those interviews. So that's also taken into account.

Also on cross-examination, defense counsel asked Anderson about Defendant's

admissions during the DSS investigation. On redirect, the State asked Anderson:

> **The State:** Ms. Anderson, when you spoke to the defendant about the lotion, you described earlier what he admitted to, what he didn't admit to.
> **Anderson:** Yes.
> **The State:** What was the significance of those statements about that topic to you while you were conducting your investigation?
> **Anderson:** The significance was that it did match what [J.R.] said. It also was a red flag to me that he would – that he admitted to taking off the child's shirt and her being alone with him with a bra was concerning to me. And that also matched what [J.R.] said.

Defendant waived appellate review of Anderson's cross-examination testimony because Anderson was responding to Defendant's questions. *See Sumner v. Sumner*, 227 N.C. 610, 613, 44 S.E.2d 40, 41 (1947) ("[U]nder the doctrine of invited error, a party cannot complain of a charge given at his request . . . or which is in substance the same as one asked by him . . . ."); N.C. Gen. Stat. § 15A-1443 (2023). In addition, as Anderson's challenged redirect testimony was within the permissible scope of her cross-examination testimony invited by Defendant, he has waived appellate review of Anderson's challenged redirect testimony. *See State v. Pearson*, 59 N.C. App. 87, 89, 295 S.E.2d 499, 500 (1982) ("[R]edirect examination is usually limited to clarifying the subject matter of the direct examination, and dealing with the subject matter brought out on cross-examination."); *Sumner*, 227 N.C. at 613, 44 S.E.2d at 41; N.C. Gen. Stat. § 15A-1443. Accordingly, Defendant's arguments are meritless. *See State v. Barber*, 147 N.C. App. 69, 74, 554 S.E.2d 413, 416 (2001).

**B. Mistrial**

Finally, Defendant argues the trial court erred by failing to declare a mistrial sua sponte after Anderson's testimony that DSS made a maltreatment finding and substantiated J.R.'s sexual abuse allegations against Defendant.

Upon its own motion, a trial court "may declare a mistrial if" it "is impossible for the trial to proceed in conformity with law . . . ." N.C. Gen. Stat. § 15A-1063 (2023). Because a mistrial is a "drastic remedy, warranted only for such serious improprieties as would make it impossible to attain a fair and impartial verdict[,]" *State v. Taylor*, 362 N.C. 514, 538, 669 S.E.2d 239, 260 (2008) (cleaned up), "the decision as to whether substantial and irreparable prejudice has occurred lies within the sound discretion of the trial judge and . . . his decision will not be disturbed on appeal absent a showing of abuse of discretion[,]" *State v. Williamson*, 333 N.C. 128, 138, 423 S.E.2d 766, 772 (1985). "An abuse of discretion occurs 'only upon a showing that the judge's ruling was so arbitrary that it could not have been the result of a reasoned decision.'" *State v. Salentine*, 237 N.C. App. 76, 81, 763 S.E.2d 800, 804 (2014) (quoting *State v. Dial*, 122 N.C. App. 298, 308, 470 S.E.2d 84, 91 (1996)).

Here, Anderson testified that DSS made a maltreatment finding during its investigation into J.R.'s allegations of sexual abuse against Defendant. Moments later, the trial court sustained Defendant's objection to Anderson's statement that DSS "substantiated sexual abuse against [Defendant] towards [J.R.] and that he would be placed on the responsible individuals list." But, as described above, the trial court did not err by allowing Anderson to testify that DSS made a maltreatment

finding, and the trial court granted Defendant's motion to strike Anderson's statement and issued a curative instruction. As such, the trial court's decision not to declare a mistrial sua sponte was not arbitrary. *See id.* at 81, 763 S.E.2d at 804. Accordingly, the trial court did not abuse its discretion.

## V. Conclusion

The trial did not plainly err by allowing Anderson to testify that DSS made a maltreatment finding and placed Defendant on the responsible-individuals list. Similarly, the trial court did not abuse its discretion by failing to declare a mistrial sua sponte in response to Anderson's challenged testimony. Accordingly, we discern no error.

NO ERROR.

Judges GRIFFIN and MURRY concur.

Report per Rule 30(e).