IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-683

Filed 3 June 2026

Dare County, Nos. 21CR051305-270, 21CR051582-270

STATE OF NORTH CAROLINA

v.

TYRIQUE LAZARA WISE

Appeal by Defendant from judgments entered 8 March 2024 by Judge R. Andrew Womble in Dare County Superior Court. Heard in the Court of Appeals 20 May 2026.

*Attorney General Jeff Jackson, by Director of Major Litigation Brian D. Rabinovitz, for the State-Appellee.*

*Jarvis John Edgerton, IV, for Defendant-Appellant.*

COLLINS, Judge.

Defendant appeals from judgments entered upon guilty verdicts of two counts of sale or delivery of a schedule II controlled substance, two counts of aggravated death by distribution, and possession of cocaine with intent to sell or distribute. Defendant argues that the trial court erred by denying his motion to dismiss the two counts of aggravated death by distribution, and that it plainly erred by admitting testimony of certain experts into evidence. For the reasons stated herein, we find no error in part, no plain error in part, and dismiss in part.

## I.   Background

Defendant was indicted for two counts of sale or delivery of a schedule II controlled substance, two counts of aggravated death by distribution, possession of cocaine with intent to sell or distribute, and maintaining a vehicle for keeping and selling a controlled substance.  The matter came on for trial on 4 March 2024.

The evidence at trial tended to show the following: On 12 September 2021, Emily Payne; her mother; and her boyfriend, George Bowman, went to the beach from approximately 12:30 p.m. to 4:00 p.m.  After returning to Emily and George's house, the group went to a birthday party next door.  Rachel Cockerham, a friend of Emily and George, was also at the party.  She told them that she had contacted someone to purchase cocaine and that it would arrive from Elizabeth City in approximately forty-five minutes.  Emily and George then sat on their back porch with Rachel to wait for the cocaine.

A man arrived at the house with the cocaine shortly thereafter.  George offered the man a line of cocaine and he responded, "I don't do that."  Rachel snorted a line of cocaine, followed by George and Emily.  Emily vomited immediately after ingesting the cocaine and passed out.  After regaining consciousness, she went inside and told her mother that she could not find George.  Emily's mother went to the back porch to look for George and found Rachel slumped over in a chair.  She called 911, and officers from the Dare County Sheriff's Office and EMS arrived several minutes later.  An officer saw Rachel "lying on the back deck where the steps are leading up to the deck";

she was cold, purple, stiff, and had no pulse. An officer found George slumped over near the HVAC unit; he was cold, stiff, and had no pulse.

On the back porch were two white chairs, a small round table, multiple beer cans, cigarette packs, credit cards, and a "small, clear plastic bag with a knot in it with a white powder substance inside[.]" An officer found a blue plate with white powder residue and a rolled-up dollar bill just inside the house. The white powder substance from the plastic bag was tested and determined to be .3066 grams of a cocaine-fentanyl mixture. The white powder residue from the blue ceramic plate was tested and determined to be cocaine.

The following day, Rachel's sister told an officer that she and Rachel had been purchasing cocaine from Defendant since June 2021, and that Defendant had sold Rachel cocaine the night she died. Rachel's sister participated in a controlled buy on 23 September 2021, which led to Defendant's arrest.

Emily tested positive for cocaine at Outer Banks Hospital where she was treated.[1] Post-mortem toxicology tests were performed on George and Rachel. George had 250 mg/dl of ethanol; 18 mg/L of cocaine; .021 mg/L of cocaethylene; .12 mg/L of benzoylecgonine; and 4.2 nanograms/mL of fentanyl in his system. Rachel had 180 mg/dl of ethanol; .31 mg/L of cocaine; .057 mg/L of cocaethylene; .32 mg/L of

---

[1] The screening test is not capable of testing fentanyl, as fentanyl is a manmade substance.

benzoylecgonine; and 30 nanograms/mL of fentanyl in her system. The cause of death for both victims was determined to be multi-drug toxicity.

Defendant moved to dismiss all the charges; the trial court allowed the motion as to the maintaining a vehicle for keeping and selling a controlled substance charge. The jury returned guilty verdicts for the remaining charges. The trial court entered three separate judgments and sentenced Defendant to consecutive terms of 17 to 30 months' imprisonment for sale or delivery of a schedule II controlled substance and possession of cocaine with intent to sell or distribute; 207 to 261 months' imprisonment for one count of aggravated death by distribution; and 207 to 261 months' imprisonment for sale or delivery of a schedule II controlled substance and one count of aggravated death by distribution. Defendant appealed.

## II.    Discussion

### A. Motion to Dismiss

Defendant argues that the trial court erred by denying his motion to dismiss the two counts of aggravated death by distribution.

We review a trial court's denial of a motion to dismiss de novo. *State v. Chavis*, 278 N.C. App. 482, 485 (2021). "In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Clawson*, 291 N.C. App. 234, 242 (2023) (quotation marks and citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *State v. Rivera*, 216 N.C. App. 566, 568 (2011) (quotation marks and citation omitted). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192 (1994) (citation omitted).

### 1. *Proximate Cause*

Defendant argues that the State presented insufficient evidence that the ingestion of cocaine, as opposed to fentanyl, was the proximate cause of George's and Rachel's overdose deaths. Defendant specifically asserts that "the State's undisputed evidence at trial was that [George] and Rachel died because they stopped breathing as a result of fentanyl ingestion."

To survive a motion to dismiss a charge of aggravated death by distribution through unlawful sale of certain controlled substances, the State must provide substantial evidence that:

> (1) The person unlawfully sells at least one certain controlled substance.
>
> (2) The ingestion of the certain controlled substance or substances causes the death of the user.
>
> (3) The commission of the offense . . . was the proximate cause of the victim's death.
>
> . . . .
>
> (5) The person has a previous conviction under . . . G.S. 90-95(a)(1) . . . .

N.C. Gen. Stat. § 14-18.4(c) (2019). A "certain controlled substance" includes "any

opium, opiate, or opioid; any synthetic or natural salt, compound, derivative, or preparation of opium, opiate, or opioid; cocaine or any other substance described in G.S. 90-90(1)(d); methamphetamine; a depressant described in G.S. 90-92(a)(1); or a mixture of one or more of these substances." *Id.* § 14-18.4(d) (2019).

"Proximate cause is a cause that produced the result in continuous sequence and without which it would not have occurred, and one from which any man of ordinary prudence could have foreseen that such a result was probable under all the facts as they existed." *State v. Powell*, 336 N.C. 762, 771 (1994) (citation omitted). "The question of whether a defendant's conduct was the proximate cause of death is a question for the jury." *State v. Noble*, 226 N.C. App. 531, 535 (2013) (cleaned up).

Viewed in the light most favorable to the State, there was substantial evidence that ingestion of the cocaine sold by Defendant was the proximate cause of George's and Rachel's overdose deaths. Forensic Scientist Ashley Lancaster testified that the white powder from the plastic bag was tested and determined to be .3066 grams of a cocaine-fentanyl mixture, and that the residue from the blue plate was tested and determined to be cocaine. Deputy Chief Medical Examiner Sandra Bishop-Freeman testified that both George and Rachel had alcohol, cocaine, and fentanyl in their systems. George had 250 mg/dl of ethanol; 18 mg/L of cocaine; .021 mg/L of cocaethylene; .12 mg/L of benzoylecgonine; and 4.2 nanograms/mL of fentanyl in his system. Rachel had 180 mg/dl of ethanol; .31 mg/L of cocaine; .057 mg/L of cocaethylene; .32 mg/L of benzoylecgonine; and 30 nanograms/mL of fentanyl in her

system. Forensic pathologist Thomas Sporn testified that "multi-drug toxicity" was the cause of death for both victims, and that the drugs "all acted in concert." The State need not prove that cocaine alone caused the deaths because N.C. Gen. Stat. § 14-18.4(d) defines a "certain controlled substance" to include "any opium, opiate, or opioid; any synthetic or natural salt, compound, derivative, or preparation of opium, opiate, or opioid; cocaine . . . ; or *a mixture of one or more of these substances*." N.C. Gen. Stat. § 14-18.4(d) (emphasis added). Although Defendant's expert, Dr. Leffler, opined that both deaths were likely caused by fentanyl and alcohol, the trial court must give the State the benefit of every reasonable inference and resolve any contradictions in its favor in ruling on a motion to dismiss. *See Rose*, 339 N.C. at 192.

Taken together, there was sufficient evidence to permit a reasonable juror to find that ingestion of the cocaine sold by Defendant was the proximate cause of both victims' deaths. *See* N.C. Gen. Stat. § 14-18.4(c).

### 2. *Aggravated Death by Distribution*

Defendant next argues that the State "tendered insufficient evidence that Defendant distributed controlled substances to decedent [George] as required for the jury to find Defendant guilty of the aggravated death by distribution charge alleging [George] as the victim."

Defendant concedes in his reply brief that his argument is premised on an incorrect version of N.C. Gen. Stat. § 14-18.4(c). As the State correctly notes, Defendant's opening brief relies not on the enacted statutory language, but instead

on wording contained in House Bill 474–the initial draft of N.C. Gen. Stat. § 14-18.4(c). That bill proposed that a person could be guilty of aggravated death by distribution through unlawful sale of certain controlled substances if, among other elements, "[t]he person unlawfully distributed at least one certain controlled substance *to the victim*." H.B. 474, 2019 Gen. Assemb., Reg. Sess. (N.C. 2019) (emphasis added).

The General Assembly ultimately adopted materially different language than that in House Bill 474. The enacted statute removes the requirement that the controlled substance be distributed "to the victim" and instead provides that a person is guilty of aggravated death by distribution if, among other elements, "[t]he person unlawfully sells at least one certain controlled substance." N.C. Gen. Stat. § 14-18.4(c)(1). Accordingly, the State was not required to prove that Defendant sold a certain controlled substance to both George and Rachel, as Defendant contends.

Here, the State presented substantial evidence that Defendant sold the cocaine-fentanyl mixture which was the proximate cause of both victims' deaths. Emily testified that Rachel told her and George that she had contacted someone to buy cocaine and that it would arrive from Elizabeth City in approximately forty-five minutes; they sat on Emily and George's back porch to wait for the cocaine; and a man later arrived at the house with the cocaine. She further testified that George offered the man a line of the cocaine, and the man responded, "I don't do that"; and she, Rachel, and George each snorted a line of the cocaine the man had sold. Rachel's

sister testified that she and Rachel had been purchasing cocaine from Defendant since June 2021; and she texted Defendant the morning after Rachel's death to ask whether he had sold cocaine to Rachel the night before, and Defendant responded yes.

Accordingly, the State presented sufficient evidence that Defendant "unlawfully [sold] at least one certain controlled substance." *See id.*

## B. Admission of Testimony

Defendant argues that the trial court "violated [his] right to confrontation guaranteed by the Sixth Amendment to the United States Constitution when it allowed into evidence testimonial hearsay about the results of toxicology testing performed by a non-testifying analyst." Defendant acknowledges that he did not object to the testimony that he now argues was erroneously admitted, but he "specifically and distinctly" argues that the admission amounted to plain error. *See* N.C. R. App. P. 10(a)(4).

"For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518 (2012) (citation omitted). "To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Id.* (quotation marks and citations omitted).

## 1. Dr. Bishop-Freeman's Testimony

Defendant argues that the trial court erroneously admitted Dr. Bishop-Freeman's testimony because she "never testified that she conducted any toxicology analysis herself, and never offered her own independent conclusions about the chemical content of the samples analyzed."

The Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. "[T]he Confrontation Clause bars the admission of out-of-court testimonial statements unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him or her." *State v. Morgan*, 359 N.C. 131, 154 (2004) (citation omitted).

North Carolina Rule of Evidence 702(a) provides:

> (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
>
>> (1) The testimony is based upon sufficient facts or data.
>>
>> (2) The testimony is the product of reliable principles and methods.
>>
>> (3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702(a) (2023). The expert may base the opinion or inference on facts or data "perceived by or made known to him at or before the

hearing." *Id.* § 8C-1, Rule 703 (2023). However, "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." *Id.*

Although the North Carolina Rules of Evidence permit an expert to present an opinion based on inadmissible facts or data, "this evidentiary rule must comport with constitutional requirements." *State v. Ortiz-Zape*, 367 N.C. 1, 5 (2013). In *Ortiz-Zape,* our Supreme Court held that "admission of an expert's independent opinion based on otherwise inadmissible facts or data of a type reasonably relied upon by experts in the particular field does not violate the Confrontation Clause so long as the defendant has the opportunity to cross-examine the expert." *Id.* at 9 (cleaned up). The Court emphasized that "the expert must present an independent opinion obtained through his or her own analysis and not merely surrogate testimony parroting otherwise inadmissible statements." *Id.* (quotation marks and citation omitted).

More recently, in *State v. Lester*, the Court clarified that "machine-generated raw data, if truly machine-generated, [is] neither hearsay nor testimonial under the Confrontation Clause." 387 N.C. 90, 100 (2025) (quotation marks and citation omitted). The Court distinguished between (1) computer-stored evidence, which "refers to evidence that originates in substance from a human source but is simply housed in electronic form" and (2) human interpretations of computer-produced data, which "draws from a computer's output but ultimately reflects a person's conclusion

about past events and human actions not revealed in raw, machine-produced data."
*Id.* at 101 (quotation marks and citations omitted).

Therefore, under *Ortiz-Zape* and *Lester*, the relevant inquiry is whether the challenged testimony reflects an expert's independent opinion based on machine-generated data, or instead merely constitutes surrogate testimony parroting the testimonial statements of a non-testifying analyst.

Here, Dr. Bishop-Freeman testified, in relevant part, as follows:

> Q. At some point did you receive a request to do a toxicology analysis on a George Bowman, Jr.?
>
> A. Yes.
>
> Q. And have you had a chance to review the report of those findings and the toxicology report?
>
> A. Briefly, but I need to look at my notes.
>
> Q. Are you required to sign off on that report before it is sent back to the requesting doctor who performs the autopsy?
>
> A. The report is generated provisionally in our laboratory and it's my responsibility to review those reports and the report would only get sent to the medical examiner or the pathologist if I approved and certified those results.
>
> Q. And you said, Doctor, that you do remember certifying the results with respect to George Bowman, Jr.?
>
> A. Yes.
>
> . . . .
>
> Q. Dr. Bishop-Freeman, I'm handing you what's been marked State's Exhibit 30 for identification purposes. Do you recognize that?
>
> A. I do.
>
> Q. And is that the report that you signed off on with

respect to the toxicology analysis for George Bowman, Jr.?

A. It's the electronically generated copy of that report and yes, this is the final report.

. . . .

Q. Dr. Bishop-Freeman, did you also receive a request to perform a toxicology analysis for a Rachel Cockerham?

A. Yes.

. . . .

Q. Was there a toxicology report prepared in connection with that?

A. Yes.

. . . .

Q. Dr. Bishop-Freeman, I'm handing you what's been marked as State's Exhibit 31 for identification purposes. Do you recognize this?

A. Yes.

Q. Is that the report that was prepared -- toxicology report that was prepared with respect to Rachel Cockerham?

A. Yes. This is the electronic copy of the report generated from this original report that I certified at our office.

Q. So you signed off and certified that particular copy?

A. Yes, I approved.

Although Dr. Bishop-Freeman did not perform the toxicology testing, the values reflected in the toxicology reports constitute machine-generated raw data. *See id.* at 100. Standing alone, those values are not the product of human interpretation but rather the output of the laboratory's analytical instruments. The toxicology reports became human interpretations of machine-generated data when they were reviewed, approved, and certified. Dr. Bishop-Freeman testified that she personally reviewed

those reports and approved and certified the results prior to releasing them to the requesting medical examiner. Because Dr. Bishop-Freeman testified at trial and was subject to cross-examination, the admission of her testimony did not violate the Confrontation Clause.

Accordingly, the trial court did not err by admitting Dr. Bishop-Freeman's testimony.

### 2. Dr. Leffler's Testimony

Defendant argues that the trial court erroneously admitted the testimony of Dr. Leffler, his own expert witness, because she "relied on the OME toxicology reports as basis evidence for her own expert opinions, without testing any samples herself or generating her own independent opinions about the chemical composition of the samples."

"A defendant is not prejudiced by . . . error resulting from his own conduct." N.C. Gen. Stat. § 15A-1443(c) (2023). "Thus, a defendant who invites error has waived his right to all appellate review concerning the invited error, including plain error review." *State v. Barber*, 147 N.C. App. 69, 74 (2001) (citation omitted). "Our courts have consistently applied the invited error doctrine when a defendant's affirmative actions directly precipitate error." *State v. Miller*, 289 N.C. App. 429, 433 (2023) (citations omitted).

Here, Defendant retained Dr. Leffler as his own expert witness and presented her testimony in support of his defense. Defendant elicited Dr. Leffler's opinions

regarding the victims' causes of death on direct examination using the toxicology reports. Defendant questioned Dr. Leffler about the contents of those reports and relied upon her testimony to challenge the State's causation evidence. Any alleged error arising from Dr. Leffler's testimony regarding the toxicology reports was the direct result of Defendant's affirmative conduct in offering the witness and eliciting the challenged testimony. *See id.* Defendant may not invite the admission of evidence for strategic purposes at trial and then contend on appeal that the same evidence was admitted in error. *See Barber*, 147 N.C. App. at 74.

Accordingly, Defendant has waived appellate review of any error that may have resulted from the admission of Dr. Leffler's testimony.

### 3. *Substantial Evidence of Guilt*

Even assuming arguendo that the challenged testimony of Dr. Bishop-Freeman and Dr. Leffler was erroneously admitted, Defendant cannot establish that the error constituted plain error.

Here, Emily testified that Rachel told her and George that she had contacted someone to purchase cocaine and that he would arrive in approximately forty-five minutes; a man arrived with the cocaine shortly thereafter; she, George, and Rachel each snorted a line of cocaine; and she immediately vomited and passed out. Emily's mother testified that she found Rachel slumped over on the porch and called 911. Captain Barrera testified that George and Rachel were dead when he arrived at the scene. Rachel's sister testified that she and Rachel had been purchasing cocaine from

Defendant since June 2021 and that she texted Defendant after Rachel's death, who confirmed that he had sold Rachel cocaine that night.

Officers found a plastic bag containing a white powder substance, credit cards, and a rolled-up dollar bill on the back porch, and a blue plate with a white powder residue and a rolled-up dollar bill just inside the house. The white powder substance from the plastic bag was tested and determined to be .3066 grams of a cocaine-fentanyl mixture, and the residue on the blue plate was tested and determined to be cocaine. The Outer Banks Hospital doctor testified that Emily tested positive for cocaine following the incident, and Sporn testified that George and Rachel died from multi-drug toxicity.

In light of this substantial evidence of Defendant's guilt, Defendant cannot show that, "absent the error, the jury probably would have returned a different verdict." *Lawrence*, 365 N.C. at 519. Accordingly, admission of the challenged testimony did not amount to plain error.

### III. Conclusion

The trial court did not err by denying Defendant's motion to dismiss, and it did not plainly err by admitting Dr. Bishop-Freeman's testimony. Accordingly, we find no error in part and no plain error in part. As Defendant has waived appellate review of any error that may have resulted from the admission of Dr. Leffler's testimony, we dismiss this portion of his appeal.

NO ERROR IN PART; NO PLAIN ERROR IN PART; DISMISSED IN PART.

Judges WOOD and FLOOD concur.